# MINNESOTA MINING & MANUFACTURING CO.
## *v.* NEW JERSEY WOOD FINISHING CO.

No. 291.  Argued April 29, 1965.—Decided May 24, 1965.

*Sidney P. Howell, Jr.,* argued the cause for petitioner. With him on the briefs were *Charles C. Trelease* and *Edwin E. McAmis.*

*Albert G. Besser* argued the cause and filed a brief for respondent.

*Lewis C. Green* and *Gustav B. Margraf* filed a brief for Reynolds Metals Co., as *amicus curiae,* urging reversal.

Briefs of *amici curiae,* urging affirmance, were filed by *Solicitor General Cox, Assistant Attorney General Orrick, Frank Goodman, Robert B. Hummel* and *Irwin A. Seibel* for the United States, and by *Alex Akerman, Jr., Thomas A. Ziebarth* and *Robert E. Staed* for Highland Supply Corp.

MR. JUSTICE CLARK delivered the opinion of the Court.

This private treble-damage antitrust action was brought by the New Jersey Wood Finishing Company against Minnesota Mining and Manufacturing Company and the

Essex Wire Corporation.[1] Respondent's original complaint was filed on November 20, 1961.[2] It alleged violations of § 7 of the Clayton Act,[3] a conspiracy to restrain commerce in electrical insulation products in violation of § 1 of the Sherman Act and an attempt to monopolize the same as prohibited by § 2.[4] The substance of the complaint concerned the acquisition in 1956 of all the assets of Insulation and Wires, Inc., a subsidiary of Essex, by Minnesota Mining and an alleged conspiracy to restrain trade in electrical insulation products. The latter claimed that the suit was barred by the four-year limitation provision of the Clayton Act.[5] However, New Jersey Wood asserted that the bar of the statute had been tolled by a proceeding filed in 1960 against Minnesota Mining by the Federal Trade Commission under § 7 of the Clayton Act. That action resulted in a consent order under which Minnesota Mining was directed to divest itself of the assets acquired. Section 5 (b) of the Clayton Act[6] pro-

---

[1] The case was considered on interlocutory appeal. 28 U. S. C. § 1292 (b) (1958 ed.). Essex did not appeal and is not a party here.

[2] During the pendency of the case in the District Court respondent filed an amended complaint. However, respondent's theories of recovery and the controlling legal questions are common to both pleadings.

[3] 38 Stat. 731, as amended, 15 U. S. C. § 18 (1964 ed.).

[4] 26 Stat. 209, as amended, 15 U. S. C. §§ 1, 2 (1964 ed.).

[5] Section 4B of the Clayton Act, 69 Stat. 283, 15 U. S. C. § 15b (1964 ed.), provides that:

"Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued. No cause of action barred under existing law on the effective date of this section and sections 15a and 16 of this title shall be revived by said sections."

[6] Section 5 (b), 38 Stat. 731, as amended, 15 U. S. C. § 16 (b) (1964 ed.), provides:

"(b) Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any

vides that a "civil or criminal proceeding . . . instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws" suspends the running of the statute of limitations during the pendency thereof and for one year thereafter with respect to private actions arising under those laws and based on any matter complained of in the government suit. The questions here are whether proceedings by the Federal Trade Commission toll the running of the § 4B statute of limitations to the same extent as do judicial proceedings and, if they do, whether the claim of New Jersey Wood is based on "any matter complained of" in the Commission action. The District Court denied Minnesota Mining's motion to dismiss, holding that the four-year statute had been tolled by § 5 (b) and that this suit was timely filed. 216 F. Supp. 507. The Court of Appeals affirmed. 332 F. 2d 346. We granted certiorari because of a conflict between circuits [7] and the importance of the question in the administration of the Clayton Act. 379 U. S. 877.

## I.

New Jersey Wood is engaged in the manufacture of electrical insulation materials, some of which it sells to independent distributors who, in turn, sell to wire and

---

of the antitrust laws, but not including an action under section 15a of this title, the running of the statute of limitations in respect of every private right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: *Provided, however,* That whenever the running of the statute of limitations in respect of a cause of action arising under section 15 of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued."

[7] See *Highland Supply Corp.* v. *Reynolds Metals Co.,* 327 F. 2d 725 (C. A. 8th Cir. 1964).

cable manufacturers and fabricators. Minnesota Mining is a diversified company, with one of its divisions producing electrical insulation materials. Essex is a substantial consumer of electrical insulation material. It owned Insulation Wires which distributes that type of material.

In August 1956 Minnesota Mining bought all the assets of Insulation Wires and in 1960 the Federal Trade Commission filed a proceeding against it under § 7 of the Clayton Act which resulted in a consent order directing the divestiture by Minnesota Mining of the assets so acquired. This order was dated August 24, 1961. The Commission charged that prior to 1953 Minnesota Mining was the leading manufacturer of electrical insulation tape; that through five transactions in the years 1952 through 1956 it had also brought under its control substantial shares of other major electrical product lines; and that its subsequent acquisition of two of the three largest distributors of these products might have the effect of actually or potentially lessening competition and tending to create a monopoly in various aspects of that commerce. One of the two distributors so acquired was Insulation Wires.

Thereafter, within a year, this suit was filed. We need not detail the allegations of the complaint. It is sufficient to say that the gist of it was that prior to August 1956 Insulation Wires was the primary distributor of New Jersey Wood products throughout the United States; that in August 1956 Minnesota Mining acquired all of the assets of Insulation Wires and during the next month notified New Jersey Wood that beginning in January 1957 Insulation Wires would no longer distribute its products. The complaint also charged Minnesota Mining and Essex with conspiring to restrain trade and commerce in the manufacture, sale and distribution of electrical insulation products beginning with the acquisition of Insulation

Wires and continuing until the filing of this suit. There were numerous overt acts alleged as being in furtherance of the conspiracy, the first of which was that acquisition.

## II.

At the outset it is necessary to examine § 5 (a) of the Clayton Act [8] and its relationship to § 5 (b). The former makes a final judgment or decree in any civil or criminal proceeding brought by or on behalf of the United States prima facie evidence in subsequent private suits "as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto." Several distinctions between these sections are apparent and suggest that they are not wholly interdependent. First, the words "final judgment or decree" are used in § 5 (a) and are of crucial significance in its application. However, § 5 (b) tolls the statute of limitations set out in § 4B from the time suit is instituted by the United States regardless of whether a final judgment or decree is ultimately entered. Its applicability in no way turns on the success of the Government in prosecuting its case. Moreover, under § 5 (a) the judgment or decree may be used only as to matters respecting which it would operate as an estoppel between the parties. No such limitation ap-

---

[8] Section 5 (a), 38 Stat. 731, as amended, 15 U. S. C. § 16 (a) (1964 ed.), provides:

"(a) A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws or by the United States under section 15a of this title, as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: *Provided*, That this section shall not apply to consent judgments or decrees entered before any testimony has been taken or to judgments or decrees entered in actions under section 15a of this title."

pears in the tolling provision. It applies to every private right of action based in whole or in part on "any matter" complained of in the government suit.

When we turn from the express language of these two statutory provisions to the congressional policies underlying them, it becomes even more apparent that the applicability of § 5 (a) to Federal Trade Commission actions should not control the question whether such proceedings toll the statute of limitations. We have discussed these policies at greater length below. At this juncture it is sufficient to say that in framing § 5 (a) Congress focused on the narrow issue of the use by private parties of judgments or decrees as prima facie evidence. This was recognized in *Emich Motors Corp.* v. *General Motors Corp.,* 340 U. S. 558 (1951), where we stated that the purpose of § 5 (a) was "to minimize the burdens of litigation for injured private suitors by making available to them all matters previously established by the Government in antitrust actions" and to permit them "as large an advantage as the estoppel doctrine would afford had the Government brought suit." *Id.,* at 568. As we shall show, however, its purpose in adopting § 5 (b) was not so limited, for it was not then dealing with the delicate area in which a judgment secured in an action between two parties may be used by a third. Whatever ambiguities may exist in the legislative history of these provisions as to other questions, it is plain that in § 5 (b) Congress meant to assist private litigants in utilizing any benefits they might cull from government antitrust actions. See S. Rep. No. 619, 84th Cong., 1st Sess., 6. The distinction was emphasized in *Union Carbide & Carbon Corp.* v. *Nisley,* 300 F. 2d 561 (1962), where the court, after noting the analysis of § 5 (a) set out in *Emich Motors Corp., supra,* stated that:

"The corollary purpose of the tolling provisions of the second paragraph of Section 5 [now § 5 (b)] is

to vouchsafe the intended benefits of related government proceedings by suspending the running of the statute of limitations until the termination of the government proceedings, and allowing the private suitor one year thereafter in which to prepare and file his suit. The competency of a government judgment in a private suit is necessarily restricted to the requirements of due process. But the tolling of the statute during the pendency of the government litigation is not so limited." *Id.*, at 569.

In our view, therefore, the two sections are not necessarily coextensive; they are governed by different considerations as well as congressional policy objectives. This makes § 5 (b) readily severable from § 5 (a). Even if we assumed *arguendo* that § 5 (a) is inapplicable to Commission proceedings—a question upon which we venture no opinion—that conclusion would be immaterial in our consideration of § 5 (b) and § 4B. Congress has expressed its belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws. This construction will lend considerable impetus to that policy.

### III.

Section 5, later §§ 5 (a) and 5 (b), was passed in response to the plea of President Wilson. In a speech to the Congress on January 20, 1914, he urged that a law be enacted which would permit victims of antitrust violations to have "redress upon the facts and judgments proved and entered in suits by the Government" and that "the statute of limitations . . . be suffered to run against such litigants only from the date of the conclusion of the Government's action." 51 Cong. Rec. 1964. The broad aim of this enactment was to use "private self-interest as a means of enforcement" of the antitrust laws. *Bruce's Juices, Inc.* v. *American Can Co.*, 330 U. S. 743, 751

(1947). The "entire provision [was] intended to help persons of small means who are injured in their property or business by combinations or corporations violating the antitrust laws." H. R. Rep. No. 627, 63d Cong., 2d Sess., 14. See S. Rep. No. 619, *supra,* at 6.

It may be, as Minnesota Mining contends, that when it was enacted the tolling provision was a logical backstop for the prima facie evidence clause of § 5 (a). But even though § 5 (b) complements § 5 (a) in this respect by permitting a litigant to await the outcome of government proceedings and use any judgment or decree rendered therein—a benefit which often is of limited practical value [9]—it is certainly not restricted to that effect. As we have pointed out, the textual distinctions as well as the policy basis of § 5 (b) indicate that it was to serve a more comprehensive function in the congressional scheme of things. The Government's initial action may aid the private litigant in a number of other ways. The pleadings, transcripts of testimony, exhibits and documents are available to him in most instances. In fact, the rules of the Commission so provide. 16 CFR § 1.132 (e). See generally 16 CFR § 1.131 *et seq.* Moreover, difficult questions of law may be tested and definitively resolved before the private litigant enters the fray. The greater resources and expertise of the Commission and its staff render the private suitor a tremendous benefit aside from any value he may derive from a judgment or decree. Indeed, so useful is this service that government proceedings are recognized as a major source of evidence for private parties. See Bicks, The Department of Justice and Private Treble Damage Actions, 4 Antitrust Bull. 5 (1959); Loevinger, Handling a Plaintiff's Antitrust Damage Suit, 4 Antitrust Bull. 29 (1959).

---

[9] See *Theatre Enterprises, Inc.* v. *Paramount Film Distributing Corp.,* 346 U. S. 537 (1954).

Admittedly, there is little in the legislative history to suggest that Congress consciously intended to include Commission actions within the sweep of the tolling provision. But neither is there any substantial evidence that it consciously intended to exclude them. The fact of the matter is that the record of the 1914 legislative proceedings reveals an almost complete absence of any discussion on the tolling problem. It seems that Congress simply did not consider the extent of its coverage in the course of its deliberations.

It is in light of this legislative silence that we must determine whether § 4B is tolled by Commission proceedings. In resolving this question we must necessarily rely on the one element of congressional intention which is plain on the record—the clearly expressed desire that private parties be permitted the benefits of prior government actions. Implicit in such an objective is the necessity that the tolling provision include Commission proceedings. Otherwise the benefits flowing from a major segment of the Government's enforcement effort would, in many cases, be denied to private parties. In this connection, and of crucial significance, is the fact that the potential advantages available to such litigants because of § 5 (b) reach far beyond the specific and limited benefits accruing to them under § 5 (a). Furthermore, the § 5 (b) advantages flow as naturally from Commission proceedings as they do from Justice Department actions. Yet petitioner contends that § 4B must be tolled in the latter but not in the former. Such a grudging interpretation of the interrelationship of § 5 (b) and § 4B, however, would collide head-on with Congress' basic policy objectives. Acceptance of petitioner's position would make enjoyment of these intended benefits turn on the arbitrary allocation of enforcement responsibility between the Department and the Commission, and we must therefore reject it.

It is true that the precise language of § 5 (b) does not clearly encompass Commission proceedings. But it is not the literal wording of such a provision that is controlling where, as here, Congress has evidenced neither acceptance nor rejection of either interpretation, yet one effects a clearly expressed congressional purpose while the other defeats it. We stated the pivotal question for determination in such an event only this Term in *Burnett* v. *New York Central R. Co.,* 380 U. S. 424, 427 (1965): "[W]hether congressional purpose is effectuated by tolling the statute of limitations in given circumstances." In order to determine that intent, we must examine "the purposes and policies underlying the limitation provision, the Act itself, and the remedial scheme developed for the enforcement of the rights given by the Act." *Ibid.* Guided by these criteria, we think it clear that congressional policy sustaining § 5 (b) would be effectively served only by tolling the statute of limitations in cases such as this, and we deem that policy controlling. This analysis is not a novel one. Mr. Justice Holmes, sitting on circuit, noted in *Johnson* v. *United States,* 163 F. 30, 32:

> "A statute may indicate or require as its justification a change in the policy of the law, although it expresses that change only in the specific cases most likely to occur to the mind. The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before."

We hold, therefore, that the limitation provision of § 4B is tolled by Commission proceedings to the same ex-

tent and in the same circumstances as it is by Justice Department actions. In so holding we give effect to Congress' basic policy objectives in enacting § 5 (b)—objectives which would be frustrated should we reach a contrary conclusion and thereby deprive large numbers of private litigants of the benefits of government antitrust suits simply because those suits were pursued by one governmental agency rather than the other.

## IV.

Minnesota Mining further contends that even though § 5 (b) tolls Commission proceedings, the suit here, insofar as it asserts Sherman Act claims, is not based in part on any matter complained of in the Commission's proceeding. We cannot agree.

New Jersey Wood's Sherman Act claims rest on an alleged conspiracy to restrain and attempt to monopolize trade and commerce in the manufacture, sale and distribution of electrical insulation products. The purposes of the conspiracy were alleged to be: (1) to control Insulation Wires; (2) to prevent it from distributing New Jersey Wood products; (3) to insure that Insulation Wires' supplies were purchased from a Minnesota Mining subsidiary; (4) to effect tie-in sales of electrical insulation products with other Minnesota Mining products; and (5) to have Essex deal only with Insulation Wires in purchasing electrical insulation products to the exclusion of competitive distributors handling New Jersey Wood products. The effect of the conspiracy was alleged to be the complete disruption of the pattern of manufacture, sale and distribution that New Jersey Wood had enjoyed with Insulation Wires and denial to it of access to substantial national markets for electrical insulation products.

Certainly the allegations are based "in part" on the Commission action. It charged that the Insulation Wires acquisition, along with that of another distributor, placed

in the hands of Minnesota Mining, a manufacturer, two of the three largest distributors in the business; that following the acquisitions these distributors discontinued distribution of the products of a number of manufacturers who had used them prior to their acquisition by Minnesota Mining; and that the effect of such action by Minnesota Mining was "the actual or potential lessening of competition" in the manufacture, sale and distribution of insulation products and the foreclosure of other manufacturers from a substantial share of the markets for said products. It appears to us that both suits set up substantially the same claims. It is true that the Commission's Clayton Act proceeding required proof only of a potential anticompetitive effect while the Sherman Act carries the more onerous burden of proof of an actual restraint. The Commission complaint, however, did allege an "actual" as well as a "potential" lessening of competition, *i. e.*, manufacturers "have been foreclosed from a substantial share of the markets." Moreover, the monopolization count was phrased in terms of an "attempt to monopolize," which may be illegal though not successful. See *United States* v. *Columbia Steel Co.*, 334 U. S. 495, 525, 531–532 (1948).

Minnesota Mining's claim seems to be that the crucial difference between the Commission and the New Jersey Wood proceedings is that the former alleges conduct that *may* substantially lessen competition while the latter asserts activity that has *actually* done so. We think that this is a distinction without a difference and does not deprive New Jersey Wood of the tolling effect of § 5 (b). That clause provides for tolling as long as the private claim is based "in part on any matter complained of" in the government proceedings. The fact that New Jersey Wood claims that the same conduct has a greater anticompetitive effect does not make the conduct challenged any less a matter complained of in the government action.

It merely requires it to meet a greater burden of proof as to the effect of the conspiracy before a Sherman Act claim can be sustained.

*Affirmed.*

Mr. Justice Harlan and Mr. Justice Stewart did not participate in the decision of this case.

Mr. Justice Black, dissenting.

Section 4B of the Clayton Act bars a private antitrust damage suit unless brought within four years after the cause of action arises.[1] Section 5 (b) of the Act, as amended, 15 U. S. C. § 16 (b) (1964 ed.), however, suspends the running of this limitation period "[w]henever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws . . . ." I am unable to agree with the Court's holding that a purely administrative proceeding initiated by the Federal Trade Commission and decided by that same regulatory agency is the kind of "civil or criminal proceeding . . . instituted by the United States . . ." which tolls the statute of limitations under § 5 (b). The Court itself concedes that even as amended "the precise language of § 5 (b) does not clearly encompass Commission proceedings" and that "there is little in the legislative history to suggest that Congress consciously intended to include Commission actions within the sweep of the tolling provision." And the Solicitor General, while urging as *amicus curiae* the result the Court reaches today, candidly admits that this "result is difficult and perhaps impossible to justify in terms of conventional analysis of the text and legislative history . . . ." It is

---

[1] Section 4B of the Clayton Act, 69 Stat. 283, 15 U. S. C. § 15b (1964 ed.), provides that:

"Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued."

because I think both the language of the statute and the legislative history persuasively, if not conclusively, show that Congress did not intend the construction the Court gives § 5 (b) today, that I am unable to agree with its decision.

The whole of § 5, now divided into subdivisions (a) and (b), was passed in reponse to President Wilson's 1914 plea to Congress to enact a law designed to make it easier for antitrust victims to collect damages through private lawsuits since preparing an antitrust case against a major corporate defendant was a larger task than most injured persons could undertake. To accomplish that single purpose he recommended to Congress, as the Court notes, two things—that these victims be permitted to seek "redress upon the facts and judgments proved and entered in suits by the Government" and also that "the statute of limitations . . . be suffered to run against such litigants only from the date of the conclusion of the Government's action." 51 Cong. Rec. 1964. Congress accepted the President's recommendation and passed § 5, a single section in two paragraphs, making "a final judgment or decree . . . rendered in any criminal prosecution or in any suit or proceeding in equity brought by or on behalf of the United States . . . prima facie evidence" against a civil antitrust defendant and tolling the statute of limitations during the pendency of "any suit or proceeding in equity or criminal prosecution . . . instituted by the United States . . . ." This language of § 5 as it passed the Congress in 1914 clearly did not refer to administrative proceedings but to antitrust suits or criminal prosecutions instituted by the Government in civil or criminal courts. Moreover, the purpose and effect of the two parts of this provision were obviously complementary, permitting the injured party to utilize a final judgment obtained by the Government and also providing a means whereby the injured party could await the result of the government ac-

tion confident that his suit would not be barred by the statute of limitations. In the words of one of the committee reports, the *"entire provision* is intended to help persons of small means who are injured in their property or business by combinations or corporations violating the antitrust laws." H. R. Rep. No. 627, 63d Cong., 2d Sess., 14. (Emphasis supplied.) See S. Rep. No. 698, 63d Cong., 2d Sess., 45. Therefore, both the language and the complementary nature of the two paragraphs of § 5 ought to show beyond any doubt that the whole section as passed was intended to apply to the same kind of proceeding in the same kind of tribunal—that is a proceeding brought in a civil or criminal court, the only tribunal which in common understanding has power to render the kind of "final judgment or decree" mentioned in § 5 (a).[2] Furthermore, since the two paragraphs of § 5 when offered and when passed were regarded as an entity because of their identical language and purpose, it is not surprising that the Senators and Congressmen addressing themselves to § 5 did not specifically direct their remarks to the tolling provision as distinct from the effect to be given a court judgment or decree. Those discussing the measure naturally treated the "suit or proceeding in equity" or "criminal prosecution" set out in both paragraphs in identical terms as referring to the same kind of proceeding in the same kind of tribunal, namely a court. It is true that the language was changed in 1955 from "suit or proceeding in equity" and "criminal

---

[2] And of course, it is not at all clear that this is a suit "instituted by the United States." The Department of Justice brings suits and criminal prosecutions in the name of the United States, while an independent regulatory agency sues and is sued in its own name. And the United States does not initiate the proceedings before an administrative agency. Here for example the Federal Trade Commission filed the proceeding against petitioner. However, because of the view I take of the other language in the section, I find it unnecessary to decide this question.

prosecution" to "civil or criminal proceeding," the present language, but the legislative history of the 1955 amendment affirmatively shows that there was no intention to affect in any way the kind of court proceedings necessary to suspend the statute of limitations. Thus, I am unable to go along with the Court in construing the tolling provision of § 5 (b) as though it applies to both court and Trade Commission proceedings while treating § 5 (a) as though it may apply to court proceedings only. Such a holding would, in my judgment, run counter to the whole legislative history of the 1914 Act.

I am setting out as an Appendix some of the legislative history of the original Act and of the 1955 amendment, which points out specifically something which does not surprise me at all: that while Congress was ready to make the *final judgment of a court* prima facie evidence against a defendant, it was at the same time entirely unwilling to give such effect to *administrative hearings and orders* and was also unwilling to toll the statute of limitations during the pendency of such proceedings. It is true that many administrative agencies now conduct hearings, make findings, and issue orders in a way more or less comparable to courts. I doubt, however, that the time has even yet come when Congress would be willing to compel judges and juries to treat administrative orders as prima facie proof of a violation of law, either civil or criminal, or to treat those proceedings as though they were conducted in a court of law with all the protections there afforded litigants.

I would reverse this judgment.

## APPENDIX TO OPINION OF MR. JUSTICE BLACK, DISSENTING.

### THE 1914 ACT.

Herewith for illustration are statements made about § 5 of the 1914 Clayton Act by Senators and Congressmen

particularly interested in § 5, all of whom took part in the preparation and sponsorship of the 1914 bill or the discussions that took place as it went through the House and Senate.

Senator Walsh, the spokesman for the Judiciary Committee, led the fight for the House version of § 5 and defended it on the ground that the defendant "has had an opportunity to try out before a court, with all the forms of the law, every question involved in the *lawsuit.* . . ." 51 Cong. Rec. 13851. (Emphasis added.) And Senator Walsh later added that "Here the party has had his day in *court.* He has tried every issue, and it is simply a question, now that he has had it tried, whether he may insist upon a second *trial.*" 51 Cong. Rec. 13857. (Emphasis added.) Opponents of the "conclusive evidence" proposal of the House bill never challenged the premise, implicit in the remarks of Senator Walsh and others, that only judgments rendered in judicial proceedings were contemplated by § 5. Not once did any member of Congress suggest that under the House version, administrative findings based upon evidence which would not be admissible in a court should be conclusive of the defendant's liability in a later treble-damage action.

Senator Walsh, in arguing that his proposal would not violate the Constitution, again emphasized that § 5 did not apply to administrative orders, but only to judgments or decrees of the courts:

> "I want to say just a word with reference to the authorities to which the attention of the Senate has been invited . . . . Nobody questions them. They all lay down the rule that in an action brought against an individual who has never theretofore had his *day in court* you can not make a certificate or a recital or an order of an administrative board or anything of that kind conclusive evidence against him." 51 Cong. Rec. 13856–13857. (Emphasis added.)

On the other hand, there were Senators who thought a judgment or decree for a defendant should be equally binding on a treble-damage plaintiff. In opposing this idea, Senator White argued:

"Then, Mr. President, as has been said, it is burdensome enough to require parties to the litigation themselves to be bound by the findings of a *court* or *jury* in a particular case. So many things that we can not at the time possibly foresee influence such decisions. The way in which the evidence is produced may have its effect upon a *jury* or a *court*.

"The manner in which the case is handled by the lawyers employed may determine in the mind of a *jury* or a *court* what the *verdict* or the *judgment* shall be, and yet, Mr. President, those things should probably not have been controlling influences in the conclusions reached." 51 Cong. Rec. 13900. (Emphasis added.)

And Senator Cummins said: "But when the suit is brought, then the judgment or decree of the *court* in the *suit* that has been brought by the Government would be prima facie evidence of violation of the antitrust law . . . ." 51 Cong. Rec. 13850. (Emphasis added.)

When the bill left the conference committee and went back to the House, the managers were called on to defend the changes against charges that elimination of the criminal penalties had emasculated the bill. Chairman Webb of the House Judiciary Committee attempted to describe the proposed enforcement procedures in the strongest possible light. After reading the provision vesting enforcement responsibility in the Trade Commission, he stated:

"Now, the value of these two sections is this: That they not only give the individual the right to sue for treble damages where he pleases, and we not only

suspend the statute of limitations against an individual if a *Government* suit is brought against a trust, but we also require the *Federal Trade Commission* to stop these practices and take those guilty of such practices into court.

"But that is not all. Some argue that after the Trade Commission takes jurisdiction that excludes individuals from pursuing these other remedies. The bill further provides:

" 'No order of the commission or board or the judgment of the court to enforce the same shall in any wise relieve or absolve any person from any liability under the antitrust acts.'

"So you have three or four distinct remedies, all of which may be invoked at the same time." 51 Cong. Rec. 16274. (Emphasis added.)

It is clear therefore that Chairman Webb distinguished between suits by the "Government"—the suits to which the tolling provision applied—and proceedings of the Federal Trade Commission. He believed that the statute was suspended only when actions were brought under the direction of the Attorney General. This was confirmed a few moments later by the following exchange:

"Mr. HARDY. Under the bill does the Government have the authority to bring suit for injunction as well as private parties?

"Mr. WEBB. Yes. Section 15 gives the district attorneys under the direction of the Attorney General the right to apply for an injunction." 51 Cong. Rec. 16276.

The day following Chairman Webb's remarks Representative Floyd, another of the House managers, again attempted to persuade the House that the enforcement scheme contemplated by the bill was strong:

"That is not all. Under section 5 of the bill any private litigant injured by the unlawful acts of any

corporation where the *Government of the United States* has proceeded against such corporation and obtained a judgment, either in a *court of law or equity,* is allowed the use of that judgment or decree to show the unlawful acts of the combination to the full extent that it would be an estoppel between the Government and the original offender. . . . That is a new remedy and a most efficient remedy. The *Government of the United States,* acting in behalf of all of its citizens, prosecutes a trust, convicts it either in a *criminal court or a civil court,* and the private litigant, injured by the unlawful acts of such trust, has nothing to do in order to recover the three-fold damages except to prove the amount of damages and that the injury was done by this trust or corporation. . . .

.  .  .  .  .

"But that is not all. There are several other remedies provided in this bill. Under section 11 the violation of sections 2, 3, 7, and 8 may be enforced, respectively, by *the Trade Commission,* by the Interstate Commerce Commission, or by the Federal Reserve Board." 51 Cong. Rec. 16319. (Emphasis added.)

Another relevant discussion in the House is the following:

"Mr. McKENZIE: If this section is left in the bill, do you not feel and believe that this decree that is mentioned in this section should be the decree of the court of last resort—the Supreme Court of the land?

"Mr. VOLSTEAD. No.

.  .  .  .  .

"Mr. McKENZIE. You think it would be good policy to leave a matter of such great importance in the hands of an inferior court?

"Mr. VOLSTEAD. Yes." 51 Cong. Rec. 9079.

As originally presented to the House, § 5 also made a "judgment or decree" rendered in a "suit or proceeding in equity brought by or on behalf of the United States" conclusive against any prospective treble-damage plaintiff. Opponents of this clause vigorously challenged the constitutionality of binding a party who had never had his "day in court." The debates made it clear time and again that the proceeding contemplated was an action brought for the United States by the Attorney General, not an administrative proceeding:

"Mr. SISSON. . . . [D]oes the gentleman believe that his rights in the court should be determined upon the questions raised by the Attorney General of the United States?

"Mr. PROUTY. Why, certainly not; the Constitution expressly prohibits it. In other words, the Attorney General could go in and prevent my having a trial before a jury.

"Mr. SISSON. That is the point I had in mind.

"Mr. PROUTY. By instituting a proceeding in equity and having the case tried.

"Mr. SISSON. That is the point I had in mind, that the Attorney General, if he was disposed to do so—we would not charge that of any particular Attorney General—might cook up a case which would directly defeat the rights of every individual if he had been injured." 51 Cong. Rec. 9492.

Defenders of the proposition, on the other hand, stated:

"Mr. CULLOP. My question is this: Supposing a collusive suit was brought and the defendant won on the issue, then is every outsider barred from any further suit? According to this language he is.

"Mr. FLOYD of Arkansas . . . .

". . . My answer to that proposition is that if the time ever comes in this Government when any Attor-

ney General will enter into collusive suits with corporations and combinations engaged in unlawful acts, it will be an evil day for our Republic, a day when every statute will become useless and justice will become a mockery." 51 Cong. Rec. 9489.

Furthermore, an amendment was in fact offered to the Senate which arguably would have resulted in bringing administrative proceedings within the scope of the phrase "suit or proceeding." The amendment met with opposition and was withdrawn. The House bill originally dealt only with a "suit or proceeding in equity," and did not apply to criminal proceedings. After the bill reached the Senate, Senator Bryan moved to strike out the words "in equity," so the provision would read simply "any suit or proceeding." As observed by Senator Reed, "That would cover any kind of proceeding." Senator Culberson proposed a substitute adding the phrase "criminal prosecution or," and retaining the phrase "in equity." Senator Bryan withdrew his broader proposal and accepted Senator Culberson's limited substitute. 51 Cong. Rec. 13897–13898.

The House initially passed the Act with four substantive sections, each having a criminal penalty attached. All of the criminal penalties were removed in the Senate or in conference. Senator Reed of Missouri, leading the opposition to the bill, charged repeatedly that the Clayton Act had been stripped of all force and effectiveness:

"We end by providing a smooth and easy road which may be traveled through the years, until finally a *commission* shall issue an innocuous, non-enforcible decree, a decree that can be vitalized only by being affirmed by a court. At the conclusion of all the litigation we propose to impose no penalty, levy no fine, send no one to jail, and we permit the culprit to preserve his swag!" 51 Cong. Rec. 15867. (Emphasis added.)

Had the proponents of the measure contemplated the use of administrative findings as evidence it appears that the obvious answer to Senator Reed would have been that the bill does have teeth for the Commission's order would be admissible as prima facie evidence against the "culprit," and private claimants would be able to reclaim "his swag," three times over. Neither this, nor any other answer challenging the accuracy of Senator Reed's statement, was heard on the Senate floor, although· his complaint was repeatedly made. And in the House, Representative Nelson charged:

> "Finally, the penalty is cut out; they can do all these things, and the Trade Commission can only say, 'You must not do it any more.' Then there is the long delay in an appeal to the courts; and they go through the courts. And then what? There may be an injunction issued, but they have got away with the loot with impunity." 51 Cong. Rec. 16325.

For further examples see 51 Cong. Rec. 9079, 9169, 9488–9490, 9492, 9494–9495, 12789–12790, 13850–13851, 13856–13857, 13897–13898, 13900, 14262, 14328, 15867, 15948, 15950, 16003, 16044, 16046, 16149, 16154, 16274, 16281, 16319, 16325.

### THE 1955 AMENDMENT.

The committee reports on the amendment detailed carefully every change the bill would make, but there is absolutely no evidence that there was any intent to amend § 5 (b) for the purpose of suspending the statute of limitations during the pendency of Federal Trade Commission hearings. See H. R. Rep. No. 422, 84th Cong., 1st Sess.; S. Rep. No. 619, 84th Cong., 1st Sess. And the debates and the hearings affirmatively show that no change was intended. For example, in the 1951 hearings Representative Patman appeared before the House subcommittee considering the bill and questioned whether § 5 had been changed to deny the right of a pri-

vate litigant to use a judgment obtained by the Government. Representative Wilson assured him that: "This doesn't change the present law." Representative Keating, the author of the bill, then commented: "I think there is a slight change in existing law where it refers to the subsequent numbers. There has to be a change in phraseology in that because of what we have done in section 4. I believe that is the only change." Hearings on H. R. 3408 before the Subcommittee on Study of Monopoly Power of the House Committee on the Judiciary, 82d Cong., 1st Sess., Part 3, 98–100. And on the floor of the House in the discussion of the bill which became the present law, Representative Quigley stated:

> "It was the specific purpose of the committee in reporting this bill to in no way affect the substantive rights of individual litigants. It is simply a procedural change and suggested with the thought of setting up a uniform statute of limitations. That is the sole purpose." 101 Cong. Rec. 5131.

MR. JUSTICE GOLDBERG, dissenting.

With all deference, I dissent. I agree with the Court, *ante,* at 321, that, as we recently stated in *Burnett* v. *New York Central R. Co.,* 380 U. S. 424, 427, the pivotal question for determination is "whether congressional purpose is effectuated by tolling the statute of limitations in given circumstances." I cannot agree, however, that the Court has correctly applied that test in this case. As my Brother BLACK has so well demonstrated in his dissenting opinion, both the language and legislative history of the statutes before us clearly show that Congress did not intend that the statute of limitations applicable to private antitrust actions be tolled by the institution of a Federal Trade Commission administrative proceeding. Cf. *United States* v. *Welden,* 377 U. S. 95. It frustrates rather than effectuates congressional purpose to fail to honor the express intent of Congress in this given circumstance.