**WHITE CONSOLIDATED INDUSTRIES, INC. and Magic Chef, Inc., Plaintiffs-Appellants,**

v.

**WHIRLPOOL CORPORATION; Dart & Kraft Corporation; Hobart Corporation and Emerson Electric Company, Defendants-Appellees.**

No. 85–3622.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 20, 1985.

Decided Jan. 29, 1986.

H. Stephen Madsen, Baker & Hostetler, Cleveland, Ohio, Joseph G. Scoville, Warner Norcross, & Judd, Grand Rapids, Mich., George F. Karch, Jr., Thompson, Hine, & Flory, Neal Rains, Arter & Hadden, Cleveland, Ohio, Theodore L. Banks, Dart & Kraft, Inc., Northbrook, Ill., Arthur F. Golden, Davis, Polk, & Wardwell, New York City, William K. Holmes, Warner, Norcross, & Judd, Grand Rapids, Mich., Tefft W. Smith, Donald G. Kempf, Jr., Chicago, Ill., for defendants-appellees.

James M. Porter (argued), Thomas S. Kilbane, Walter J. Rekstis, III, John E. Lynch, Jr., Stacy D. Ballin, Squire, Sanders & Dempsey, Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, John K. Train, III, Martin J. Elgison, Alston & Bird, Atlanta, Ga., for plaintiffs-appellants.

Before KEITH and MILBURN, Circuit Judges, and PECK, Senior Circuit Judge.

KEITH, Circuit Judge.

The plaintiffs, White Consolidated Industries, Inc. and Magic Chef, Inc., appeal from a district court order, 619 F.Supp. 1022, vacating a preliminary injunction which enjoined defendant Whirlpool Corporation from purchasing the KitchenAid Division of defendant Dart & Kraft Corporation. We affirm the judgment below for the following reasons.

## FACTS

The parties in this anti-trust action are competitors in the household appliance market. Plaintiffs White Consolidated Industries, Inc. and Magic Chef, Inc. manufacture and distribute major household appliances nationwide as does the defendant Whirlpool Corporation. Defendant Dart & Kraft is a diversified food and consumer products company which acquired defendant Hobart Corporation as a subsidiary in 1981. Hobart Corporation primarily manufactures kitchen equipment through its KitchenAid Division which is known in particular for producing top-of-the-line dishwashers. The defendant Emerson Electric Company, mainly noted for its broad range of electrical and electronic products, manufactures and distributes nationally a line of garbage disposers and dishwashers.

In February 1985, plaintiffs filed suit in the United States District Court for the Northern District of Ohio alleging that Whirlpool's proposed acquisition of KitchenAid violated Section 7 of the Clayton Act, 15 U.S.C. § 18 and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Plaintiffs sought to preliminarily and permanently enjoin defendant Whirlpool from acquiring the KitchenAid Division from defendants Dart & Kraft and Hobart Corporation. Under the proposed acquisition agreement, Whirlpool would purchase from Dart & Kraft all of Hobart's KitchenAid stock, including the manufacturing assets of the dishwasher facility held by a Hobart subsidiary. Upon acquiring KitchenAid, Whirlpool proposed tendering a "curative divestiture" designed to defuse the anti-competitive effects of the transaction. The curative divestiture entailed Whirlpool selling KitchenAid manufacturing assets to defendant Emerson. After this partial dives-

titure, Whirlpool would keep the Kitchen-Aid brand name and garbage disposer manufacturing assets and Emerson would agree to supply Whirlpool's quota of the KitchenAid Model KD21 dishwashers, compactors and service parts for a guaranteed twenty percent net profit. Aside from providing Whirlpool's inventory, Emerson would be allowed to market a differentiated Model KD21 only through its own "In Sink Erator" brand name and distribution network.

After three months of discovery, the district court conducted a five week long hearing to determine whether a preliminary injunction against the deal should issue. On June 28, 1985, the district court entered an order and lengthy memorandum opinion granting plaintiffs' motion for a preliminary injunction. *See White Consolidated Industries, Inc. v. Whirlpool Corporation,* 612 F.Supp. 1009 (N.D.Ohio 1985). The district court determined that, despite the "curative divestiture" provisions of the proposed acquisition, the small number of top appliance manufacturers would garner even larger shares of the dishwasher market after the acquisition, *id.* at 1020–21, and that the combination of Whirlpool and KitchenAid in an already highly concentrated market would substantially reduce competition. *Id.* at 1030. Specifically, the trial court expressed concern that the curative divestiture provisions of the agreement failed to accord Emerson sufficient latitude in marketing the Model 21 dishwasher for it to freely compete against other dishwasher distributors. *Id.* at 1029. Moreover, the divestiture provisions failed to eradicate agreement restrictions on Emerson's ability to private label and distribute the Model 21, factors which in the district court's view, precluded Emerson from independently competing with Whirlpool and replacing KitchenAid in the market. *Id.*

Prior to finding that this evidence established a prima facie illegal transaction, the court noted:

> For this divestiture to be curative, Emerson would have to be free to manufacture, distribute and market the Model 21

under any name not confusingly similar to KitchenAid's. In addition, Emerson would have to be free to distribute the Model 21 through any means it chose. Finally, Emerson would have to be free to private label the Model 21. The court finds that these restrictions are sufficiently inhibitive of Emerson's ability to compete in the market that Emerson will not act as a post-transaction check on Whirlpool and will not in any way make up for the loss of KitchenAid.

612 F.Supp. at 1029. The district court thereupon concluded the defendants had failed to overcome the plaintiffs' prima facie case showing that the transaction would substantially reduce competition by affording Whirlpool an increasing ability to control Emerson, restrict dishwasher output and raise prices. *Id.* at 1029–30. The preliminary injunction thereafter issued.

The defendants immediately amended the agreement to incorporate the curative measures suggested in the district court opinion and moved to vacate the injunction. In considering defendants' motion to vacate the preliminary injunction, the court determined that the amendments allowed post-transaction Emerson to (1) manufacture, distribute and market the Model 21 dishwasher under any name not similar to KitchenAid's; (2) distribute the Model 21 through any system Emerson chose; and (3) issue the Model 21 under private label. Appendix A at 1229. With these changes, the court determined that Emerson gained complete control from Whirlpool over its own dishwasher production and distribution as well as the ability to replace Kitchen-Aid as a willing and viable competitor in the dishwasher market. Appendix A at 1231. The court concluded the amendments eliminated the anti-competitive effects of Whirlpool's proposed acquisition and ordered the preliminary injunction vacated:

> Given the amended supply contract, the Court finds that KitchenAid's manufactured units market share should be attributed to Emerson, and that a statistical analysis would not lead to the conclusion that the proposed transaction is at

all likely to substantially lessen competition in the dishwasher market. In addition, the Court finds that the amended supply contract gives Emerson the independence to be viable in the dishwasher market and that Emerson, with others, will be able to act as a check on the market leaders.

Accordingly, the Court finds that the plaintiffs have not demonstrated a substantial likelihood of success of proving an antitrust violation, have not shown that the transaction would cause irreparable injury, and have not shown that the transaction would be detrimental to the public interest. Accordingly, the preliminary injunction shall be vacated.

Appendix A at 1233.

## DISCUSSION

Our review of the district court order vacating the preliminary injunction is limited to determining whether the trial court abused its discretion. *Christian Schmidt Brewing v. G. Heilman Brewing,* 753 F.2d 1354, 1356 (6th Cir.1985). Four factors determine whether the order constitutes an abuse of discretion: (1) the plaintiffs' likelihood of success in proving the claimed violation; (2) the likelihood of irreparable harm to others if relief is granted or denied; (3) the impact on the public interest; and (4) the likelihood of substantial harm to others. *Id., Tate v. Frey,* 735 F.2d 986, 990 (6th Cir.1984); *Warner v. Central Trust Co.,* 715 F.2d 1121, 1123 (6th Cir.1983); *Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977).

On appeal the plaintiffs first contend that the district court abused its discretion in vacating the preliminary injunction because the amended agreement fails to sufficiently ensure Emerson's ability to replace KitchenAid as a viable competitor. Specifically, plaintiffs argue that the amended agreement still leaves Whirlpool in control of Emerson's production levels and that Emerson's marketing ability is limited because Emerson is not an integrated household appliance business with a recognized brand name, distribution network and experienced sales personnel. We do not agree. The district court expressly found that the amendments rendered Emerson an independent force in the market and that Emerson is an experienced and capable manufacturing company. Appendix A at 1231. The district court also determined that under the amended agreement Emerson had been freed to transcend entry barriers and compete in the dishwashing business as it had succeeded in entering other businesses in the past:

It is important to recognize that Emerson is not entering the market faced with traditional entry barriers. Along with its history of successful private labelling, Emerson will begin with a fully tooled plant, ready to produce a state-of-the-art machine. In addition, Emerson will have a guaranteed profits contract to supply dishwashers to Whirlpool for at least five years, which it can maintain or abandon depending upon its other successes. Emerson has a strong relationship with potential customers to which it already sells private label goods, and Emerson will be a new private labeller in the industry, replacing KitchenAid, a manufacturer unwilling to private label.

In addition, Emerson is free to expand, using its expertise, industry contacts, and other resources. If it chooses, it may develop new dishwashers to replace the Model 21 when it becomes obsolete. Emerson is also free to enter other product markets, using In-Sink-Erator, or whatever name it develops for its dishwashers. The fact is that the independent, viable Emerson created by this transaction may be able to become, if it chooses, a substantial player in more than just the dishwasher market; it may be able to take on a key role in other white goods markets, too. A KitchenAid with unenthusiastic ownership simply cannot compare to the post-transaction Emerson.

Appendix A at 1232–1233. The district court concluded that plaintiffs had failed to present convincing evidence that Emerson would not vigorously compete in the dish-

washer market or that post-transaction Emerson was not likely to surpass Kitchen-Aid as a competitor. Appendix A at 1232.

We agree with the district court that the relevant inquiry is whether the amended curative divestiture does in fact leave Emerson as a willing, independent competitor capable of effective production in the dishwasher market. Upon review of the record as a whole, we are unable to conclude that the district court's findings above or its conclusion that plaintiffs failed to show a substantial likelihood of lessened competition from the amended transaction are clearly erroneous. Nor, in our view, did the district court clearly err in discrediting plaintiff's claims that the predation and leverage of the defendants could cause irreparable injuries to themselves or substantial harm to others. *See White Consolidated Industries, Inc. v. Whirlpool Corporation*, 612 F.Supp. 1009, 1031 (N.D. Ohio 1985). Finally, since Whirlpool's proposed acquisition of KitchenAid will probably increase competition, no public interest is served by enjoining the proposed transaction. We, therefore, conclude the district court did not abuse its discretion in vacating the preliminary injunction. *See Christian Schmidt Brewing v. G. Heilman Brewing*, 753 F.2d at 1356.

Plaintiffs next contend the district court erred as a matter of law by failing to consider the impact of the transaction on the relevant compactor and disposer markets. However, in its first opinion granting the preliminary injunction, the district court noted that "although the relevant product markets are the dishwasher, disposer and compactor markets, the vast majority of the evidence at the hearing focused on the dishwasher market." 612 F.Supp. at 1014. Moreover, given the disposer and compactor spin-off provisions of the agreement, we fail to see the anti-competitive effects of the transaction on either the disposer or the compactor markets. Under the agreement, Emerson, the leading manufacturer of disposers, would receive no disposer assets which will be transferred to Whirlpool under the agreement. Whirlpool, which does not now manufacture dis-

posers, will thus be able to do so after the transaction. Similarly, Whirlpool, a leading producer of compactors, would receive none of KitchenAid's compactor manufacturing assets but would instead spin-off those assets to Emerson.

█ Finally, plaintiffs contend the district court failed to evaluate the transaction for violations of Section 1 of the Sherman Act. The district court did not address plaintiffs' claims that the transaction violated Section 1 of the Sherman Act because it had found no violation under the less stringent Clayton Act standards of proof. We find no error in the district court's analysis. In our view, the plaintiffs' failure to sustain proof of potential anticompetitive effects under Section 7 of the Clayton Act precludes them from successfully establishing proof of a conspiracy in restraint of trade under the more vigorous standard for Section 1 of the Sherman Act. *Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 323, 85 S.Ct. 1473, 1479, 14 L.Ed.2d 405 (1965), *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 486 (5th Cir.1984).

The district court's findings on plaintiffs' Clayton Act claims also preclude plaintiffs from establishing their conspiracy and attempt to monopolize claims under Section 2 of the Sherman Act. The district court determined Whirlpool had no specific intent to eliminate a competitor and was not likely to engage in anti-competitive practices. 612 F.Supp. at 1026–27, 1031. Since proof of specific intent to monopolize is required to sustain a conspiracy and attempt to monopolize claim, *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953), the district court was not required to entertain plaintiffs' Section 2 claims under the Sherman Act. Based on our review of the record, we conclude plaintiffs could not have sustained such claims.

Accordingly, the judgment below vacating the preliminary injunction is affirmed on the basis of the district court opinions

found in 612 F.Supp. 1009 (N.D.Ohio 1985) and Appendix A of this opinion.

### APPENDIX A

### UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO EASTERN DIVISION

White Consolidated Industries, Inc., Plaintiff,

-vs-

Whirlpool Corp. Dart & Kraft, Inc. Hobart Corp. Emerson Electric Co., Defendants.

Case No. C85–472

Magic Chef, Inc., Plaintiff,

-vs-

Whirlpool Corp. Dart & Kraft, Inc. Hobart Corp. Emerson Electric Co., Defendants.

Case No. C85–667

Aug. 5, 1985

### MEMORANDUM AND ORDER VACATING PRELIMINARY INJUNCTION

KRENZLER, District Judge.

On June 28, the Court granted the motions of the plaintiffs in the above-captioned cases for a preliminary injunction.[1] The Court concluded at that time that:

For the divestiture in this case to be curative, Emerson would have to be free to manufacture, distribute, and market the Model 21 under any name not confusingly similar to KitchenAid's. In addition, Emerson would have to be free to distribute the Model 21 through any means it chose. Finally, Emerson would have to be free to private label the Model 21. The Court finds that these restrictions are sufficiently inhibitive of Emerson's ability to compete in the market that Emerson will not act as a post-transaction check on Whirlpool and will not, in any way, make up for the loss of KitchenAid. *Court's Order of July 3*, Conclusion 24.

On July 1, 1985, the defendants filed a motion to vacate the preliminary injunction. Attached to the motion was a proposed amendment to the supply contract, agreed to and signed by both Whirlpool and Emerson, which allows the post-transaction Emerson to: (1) manufacture, distribute and market the Model 21 dishwasher under any name not confusingly similar to KitchenAid's; (2) distribute the Model 21 through any means it chooses; and (3) private label the Model 21.[2] The defendants' brief in support of its motion argues that the contract amendment constitutes a change in circumstances and grounds for the Court to vacate the preliminary injunction.

The plaintiffs oppose the motion to vacate on two basic grounds. They contend that even under the amended contract, Emerson will not be a viable and/or willing competitor in the dishwasher market and therefore the divestiture is still not curative. In addition, the plaintiffs continue to argue that even a viable and willing Emer-

---

1. On July 3, the Court issued a revised memorandum of opinion with minor alterations of the June 28 order. The Court's substantive conclusions in both opinions were identical, and all issues raised by the motion to vacate and the oppositions thereto were treated identically in the original and revised memorandum. Throughout this opinion, the Court will refer to the more recent July 3 memorandum, but all conclusions drawn herein are equally applicable to the original memorandum filed on June 28.

2. The document labeled "AMENDMENT" attached to the defendants' motion states that prior to the execution of the supply contract, that contract will be changed to reflect the terms agreed to in the amendment of June 29, 1985. Since in this order this Court is relying on the proposed supply contract changes reflected in the "amendment," the Court will proceed as if the proposed alterations were already incorporated in the supply contract and, therefore, as if an "amended supply contract" already existed as an integrated document. There must be no doubt that if the supply contract is ever executed, it must be in the form of an amended supply contract which completely and accurately incorporates all of the terms of the amendment of June 29, 1985. The execution of a supply contract which did not do so would be anti-competitive and illegal.

son will not cure the anti-competitive effects of the proposed transaction. The plaintiffs also argue that the question of the willingness of Emerson to actively compete, especially under the amended contract, should be saved until there can be more discovery and should be resolved at a trial on the merits.

The Court finds that plaintiffs' arguments are unpersuasive. From the evidence available to the Court after a lengthy hearing, the Court finds that under the amended supply contract, Emerson is likely to be a willing and viable competitor in the dishwasher market. Its strong independence will give it complete control over its own manufacturing output and distribution and thus will eliminate the anti-competitive concerns raised by the D & K/Whirlpool stock purchase agreement. Accordingly, the Court orders the preliminary injunction of July 3, 1985, vacated.

As in its order of July 3, the Court notes that substantial evidence was presented during the hearing concerning the effect the proposed transaction might have in markets other than dishwashers, disposers, and compactors. While the Court is mindful that this action may have been brought to protect competitive positions in those other markets, they are not relevant to this action. The Court's analysis is limited to the dishwasher, disposer, and compactor markets with primary focus on the most important of the three, the dishwasher market.

I. *The Significance of Emerson's Viability*

Both plaintiffs argue in their briefs that the Court has misconstrued, mischaracterized, and misunderstood their statistical argument regarding the attribution of KitchenAid's market share to Whirlpool. They claim that whether or not Emerson is independently viable, all of KitchenAid's market share must be assigned to Whirlpool, not Emerson, when the transaction is complete. The fact that the plaintiffs may not consider Emerson's viability to be relevant to the question of the proper post-acquisi-

tion attribution of KitchenAid's manufactured units market share does not make it irrelevant.

The Court finds Emerson's independent viability to be the key to the proper post-acquisition attribution of KitchenAid's manufactured units market share. This conclusion seems the only one to logically flow from the plaintiffs' own argument.

Magic Chef's brief in opposition to the motion to vacate maintains that, "... KitchenAid's market share must be attributed to Whirlpool because the supply contract would place that portion of Emerson's production capacity under Whirlpool's control...." *Magic Chef Brief*, p. 4. Similarly, White's brief argues:

Whether Emerson *manufactures* the KitchenAid branded dishwashers for Whirlpool or Whirlpool makes them for itself makes no difference for purposes of analyzing the competitive forces in the market—for purposes of this case, to treat Emerson as an independent manufacturer of the 7% KitchenAid dishwasher market share without recognizing the entire share constituted Whirlpool's requirements is the triumph of form over substance.... That is the economic reality of the situation and it is pure fantasy to count Whirlpool's KitchenAid market share as part of the production market share of Emerson. *White Brief*, pp. 4–5 (emphasis in original) (footnote omitted).

The plaintiffs insist that if Whirlpool absolutely controls some aspect of Emerson's production, the market share represented by those units must be attributed to Whirlpool. With that premise, the Court agrees. But the inquiry does not end there. The question then becomes, does Whirlpool, in fact, absolutely control any or all of Emerson's production.

In its previous order, the Court found that certain restrictions placed on Emerson by the supply contract so limited its independence that it might never become a viable player in the dishwasher market. This lack of independence fueled the Court's finding that Emerson would not

effectively control its own production. With the limitations in place, Emerson would be so dependent upon the requirements demands of Whirlpool that Whirlpool would have control over much of Emerson's dishwasher production. Thus, with the supply contract restrictions in place, the Court accepted the plaintiffs' market share attribution argument.

Under the amended contract, the restrictions have been eliminated and Emerson will be able to act as an independent force in the market. The plaintiffs insist that Emerson's independence and viability are irrelevant, but this claim ignores the basic premise of the attribution argument: that attribution should take place when one firm controls another's production. The Court finds, based on the evidence before it, that under the amended supply contract, Whirlpool would *not* have the control over Emerson's production which would justify attribution of KitchenAid's market share to Whirlpool rather than Emerson.

The amended contract affords Emerson the ability to seriously compete in the dishwasher market, making the supply contract less economically compelling for Emerson. While the supply contract will provide Emerson substantial profits during its pendency, an independent Emerson will be in the position to determine whether or not the supply contract is the most profitable deployment of its resources. Without substantial independence, Emerson would be forced to be content with the profits from the supply contract. Yet, the independence and viability which the amended contract provides Emerson also makes realistic its option to abandon the supply contract, on one year's notice, in favor of other, more profitable endeavors.

The plaintiffs have chosen to ignore the "economic reality" that Emerson is an impressive company with a long history of successful private labeling enterprises in a range of product markets. The Whirlpool/Emerson stock purchase agreement and the amended supply contract provide Emerson with virtually all that was once KitchenAid, leaving to Whirlpool only the KitchenAid name and the garbage disposer plant.

Under the amended supply agreement Emerson will be in complete control of its own production, with the option to maintain the supply agreement with Whirlpool or turn elsewhere with the Model 21. Emerson will be the company selling "the best dishwasher in the world" to the highest bidder, competing with other private label suppliers. At the end of this transaction, Whirlpool will simply become another of Emerson's private label customers in another one of its many product markets.

Whether or not the plaintiffs chose to accept it, their attribution argument hinges upon whether or not Whirlpool will control Emerson's production. The Court finds that the independence afforded Emerson by the amended supply contract, independence not afforded under the original supply contract, will free Emerson from any production control by Whirlpool. Accordingly, under the changed circumstances brought about by the amended supply contract, the Court finds that the attribution of post-transaction KitchenAid market share to Whirlpool would be inappropriate. KitchenAid's manufactured units market share should be attributed to Emerson, which will own the KitchenAid manufacturing plants and will control its own production destiny.

Given the attribution of KitchenAid's market share to Emerson, the Court finds that the pre- and post-transaction manufactured units market share four-firm concentrations and HHIs will be the same. Therefore, the Court finds that a statistical analysis of the proposed transaction in no way suggests the existence of anti-competitive agreements.

## II. *The Likelihood of Emerson's Viability*

While addressed in the Court's previous order and above, the Court is constrained to comment further on its view of the evidence regarding Emerson's viability in the

post-transaction dishwasher market. The plaintiffs argue strenuously in their briefs on the motion to vacate that if Emerson's viability is significant, then the evidence either: (1) demonstrates that Emerson will not be viable, or (2) is inconclusive, and thus the preliminary injunction should stand until a trial on the merits.

The Court disagrees with both of plaintiffs' contentions. White's brief on the motion includes sections entitled "there is no evidentiary basis in the record to support Emerson's likelihood of success in selling the KD–21" and "the hearing record will not support a conclusion that Emerson will be able to become a substantial participant in the dishwasher market even with the three restrictions lifted." *White's Brief,* pp. 6 and 20. Magic Chef's brief contains similar sections, all arguing that Emerson will be unwilling and/or unable to meaningfully participate in the post-transaction market.

The defendants argue in their brief in opposition that:

> Now, as a result of the amendments prompted by the Court's Opinion, Emerson—a proven successful private labeller—will be able to private label an even better product, the "best dishwasher in the world." *Defendants' Brief,* pp. 6–7.

and that:

> The record amply demonstrates that Emerson is an experienced and capable manufacturing company and that it has every intention of vigorously competing in the manufacture and sale of dishwashers and compactors. *Defendants' Brief,* p. 8.

On the evidence before the Court at this time, the Court adopts these allegations contained in the defendants' brief as its own findings.

The plaintiffs argue that the Court lacks evidence about how the Model 21 will be marketed, who it will be sold to, and a wide range of other matters, and that without this information, the injunction must stand.

This argument seems to reverse the burdens of the parties.

The defendants have demonstrated that Emerson is ready to proceed full steam ahead to manufacture and market dishwashers. While Emerson maintained that it would be able to do just that under the original supply contract, the Court found that the supply contract restrictions made Emerson's independence, and thus its success, so suspect that an injunction was necessary.

Emerson has been freed of the restrictions under the amended supply contract. The Court has found, and maintains, that the evidence before it demonstrates that Emerson has historically been successful in situations similar to its proposed entrance into the dishwasher business, and that it is likely to be successful again.

The plaintiffs have offered little evidence which effectively refutes Emerson's contention that it intends to proceed vigorously. Nor have they produced convincing evidence that shows that an unhampered Emerson would be unable to do so. The Court concludes that the post-transaction Emerson is likely to be an even more important component of the dishwasher market than was KitchenAid in the pre-transaction market.

It is important to recognize that Emerson is not entering the market faced with traditional entry barriers. Along with its history of successful private labelling, Emerson will begin with a fully tooled plant, ready to produce a state-of-the-art machine. In addition, Emerson will have a guaranteed profits contract to supply dishwashers to Whirlpool for at least five years, which it can maintain or abandon depending upon its other successes. Emerson has a strong relationship with potential customers to which it already sells private label goods, and Emerson will be a new private labeller in the industry, replacing KitchenAid, a manufacturer unwilling to private label.

In addition, Emerson is free to expand, using its expertise, industry contacts, and

other resources. If it chooses, it may develop new dishwashers to replace the Model 21 when it becomes obsolete. Emerson is also free to enter other product markets, using In-Sink-Erator, or whatever name it develops for its dishwashers. The fact is that the independent, viable Emerson created by this transaction may be able to become, if it chooses, a substantial player in more than just the dishwasher market; it may be able to take on a key role in other white goods markets, too. A KitchenAid with unenthusiastic ownership simply can not compare to the post-transaction Emerson.

The Court recognizes that its findings are substantially based upon the evidence provided by Emerson's witnesses at the hearing. The Court found Mr. Seals and Mr. Adorjan to be highly credible and gave substantial weight to their testimony. If it were to be determined later that these witnesses were either grossly misinformed or intentionally deceptive in their testimony, it is the Court which would have been deceived into accepting their positive projections. But the sworn testimony of these men convinced this Court that Emerson plans to do all that it can to compete successfully in the business, and convinced this Court that when left to its own devices, it will do just that.

Accordingly, the Court finds that the transaction, when taken as a whole, is not substantially likely to lessen competition. Given that finding, there is no likelihood that the plaintiffs will succeed on the merits and this Court must vacate its previous injunction.

### III. *Other Arguments*

The plaintiffs also argue that there are less anti-competitive alternatives to the D & K/Whirlpool stock purchase agreement. While this may or may not be true, it is not this Court's duty to permit only the most competitive agreement imaginable. This Court may only block proposed transactions which the effect of which may be to substantially lessen competition. 15 U.S.C. § 18. Since this Court has determined that the proposed transaction, when it includes the amendments to the supply contract, is not likely to substantially lessen competition, it must deny the plaintiffs' request for injunctive relief even if other, more competitive transactions are conceivable.

Finally, Magic Chef argues that the amendments to the supply contract should only be considered at trial and that more discovery should be allowed to inquire about the circumstances surrounding the contract amendments. No authority has been cited for the proposition that the Court should ignore this new and obviously relevant evidence. Clearly the contract amendments go to the heart of the Court's concerns in this case and can not be ignored. While further exploration of the circumstances surrounding the amendments remains open to the plaintiffs if there is a trial on the merits, the evidence is before the Court at this time and must be considered.

### IV. *Conclusion*

Given the amended supply contract, the Court finds that KitchenAid's manufactured units market share should be attributed to Emerson, and that a statistical analysis would not lead to the conclusion that the proposed transaction is at all likely to substantially lessen competition in the dishwasher market. In addition, the Court finds that the amended supply contract gives Emerson the independence to be viable in the dishwasher market and that Emerson, with others, will be able to act as a check on the market leaders.

Accordingly, the Court finds that the plaintiffs have not demonstrated a substantial likelihood of success of proving an antitrust violation, have not shown that the transaction would cause irreparable injury, and have not shown that the transaction would be detrimental to the public interest. Accordingly, the preliminary injunction shall be vacated.

### V. *Time to Appeal*

Also pending before the Court is the plaintiffs' contingent motion for an injunction pending appeal. In the event that the Court were to grant the defendants' motion to vacate the preliminary injunction, as the Court intends to do, the plaintiffs sought an injunction during the pendency of their appeal to that order. In the alternative, the plaintiffs sought a 10-day restraining order, staying the closing of the transaction until the plaintiffs had an opportunity to seek a longer stay from the United States Court of Appeals for the Sixth Circuit.

The defendants argue, in opposition to the motion, that if the closing should not be enjoined, then it is improper for the trial court to order a stay pending appeal. As a concession, the defendants agree to voluntarily stay the closing of the transaction for two days from the order vacating the preliminary injunction to allow the plaintiffs an opportunity to seek a further stay from the Court of Appeals.

The Court has determined that, with the amended supply contract, there is no reason to enjoin the proposed transaction. Accordingly, the Court is unwilling to grant a preliminary injunction during the pendency of the plaintiffs' appeal. Still, even the defendants have recognized that it would be fair to provide the plaintiffs some time to seek a stay from the Sixth Circuit. In order to provide the plaintiffs time to prepare and seek their request for a stay from the Sixth Circuit, this order of the Court vacating the preliminary injunction of July 3, 1985, shall not take effect until Friday, August 9, 1985. At that point, the defendants' stipulated stay of two business days from the time of the vacation of the injunction shall take effect. Thus, when this order vacating the injunction takes effect on August 9, 1985, the plaintiffs shall have until Tuesday, August 13, to seek a stay from the Sixth Circuit. If the Sixth Circuit has not stayed the transaction by Tuesday, August 13, 1985, at 5:00 p.m., the transaction may close.

IT IS SO ORDERED.