**WHITE CONSOLIDATED INDUSTRIES, INC.,**
Plaintiff,

v.

**WHIRLPOOL CORP., Dart & Kraft, Inc., Hobart Corp., Emerson Electric Co., Defendants.**

**MAGIC CHEF, INC., Plaintiff,**

v.

**WHIRLPOOL CORP., Dart & Kraft, Inc., Hobart Corp., Emerson Electric Co., Defendants.**

**Nos. C85–472, C85–667.**

United States District Court, N.D. Ohio, E.D.

July 3, 1985.

---

**2.** Plaintiff shall submit within thirty (30) days a proposed judgment upon ten (10) days notice to the defendant.

James M. Porter, Thomas S. Kilbane, James P. Murphy, Walter J. Rekstis, III, John R. Gall, John E. Lynch, Jr., Stacey D. Ballin, Squire, Sanders & Dempsey, Daniel R. Elliott, Jr., Cleveland, Ohio, for White Consol.

John K. Train, III, Martin J. Elgison, H. Stephen Harris, Jr., Alston & Bird, Atlanta, Ga., Jason C. Blackford, Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, for Magic Chef, Inc.

M. Neal Rains, Eric H. Zagrans, Stephen R. Twiss, Arter & Hadden, Cleveland, Ohio, Jerome A. Hochberg, Ann K. Sullivan, Paul H. Friedman, Arter & Hadden, Washington, D.C., William K. Holmes, Joseph A. Scoville, Tracey T. Larsen, Philip S. VanDerWeele, Warner, Norcross & Judd, Grand Rapids, Mich., Charles Putnam, Robert I. Frey, Benton Harbor, Mich., for Whirlpool Corp.

Donald G. Kempf, Jr., Tefft W. Smith, Thomas D. Yannucci, John T. Whatley, Randall A. Hack, Kirkland & Ellis, Chicago, Ill., George F. Karch, Jr., Thompson, Hine & Flory, Cleveland, Ohio, for Dart & Kraft, Inc.

Arthur F. Golden, Paul W. Bartel, Daniel L. Brackett, Davis, Polk & Wardwell, New York City, H. Stephen Madsen, Jonathan E. Thackeray, Baker & Hostetler, Cleveland, Ohio, for Emerson Elec.

KRENZLER, District Judge.

## INTRODUCTION

Plaintiff White Consolidated Industries, Inc. (hereinafter "White") filed case No. 85–472 against defendants, Whirlpool Corporation (hereinafter "Whirlpool"), Dart & Kraft, Inc. (hereinafter "D & K"), Hobart Corporation (hereinafter "Hobart"), and Emerson Electric Co. (hereinafter "Emerson"), for alleged violations of the antitrust laws of the United States. This complaint was filed in two counts. Count I alleges violations of §§ 7 and 16 of the Clayton Act (15 U.S.C. §§ 18 and 26) and Count II alleges violations of §§ 1 and 2 of the Sherman

Act (15 U.S.C. §§ 1 and 2 and 15 U.S.C. § 26).

Magic Chef, Inc. (hereinafter "Magic Chef") filed a complaint similar to White's, against the same four defendants, in the United States District Court for the Eastern District of Tennessee, Southern Division. That case was transferred to this Court and assigned case No. C85–667 and consolidated with C85–472.

The complaints seek a permanent injunction prohibiting the sale of KitchenAid to Whirlpool and Emerson. Pending before the Court are the plaintiffs' motions for a preliminary injunction.

The Court finds, given the current state of the defendants' attempted "curative divestiture," that an injunction is in order. As is discussed fully below, the curative divestiture, at this point in the proceedings, does not appear to adequately remedy the anti-competitive effects of the sale of KitchenAid to Whirlpool. The defects the Court cites in the curative divestiture are sufficiently inhibitive of Emerson's independence in the market to require an injunction at this time. Were these features absent, the Court would not have enjoined the transaction, but these limitations on Emerson's ability to freely compete mandate the issuance of a preliminary injunction.

## THE HEARING

It should be noted at the outset that the hearing on the motions for a preliminary injunction was somewhat extraordinary. Prior to the hearing, all of the parties participated in the Hart-Scott-Rodino proceedings at the Federal Trade Commission pursuant to 15 U.S.C. § 18a.[1] Thus, well before the injunction hearing had started, the parties had already done substantial preparatory work and had made complete, formal presentations of their respective positions in another forum. In addition, though time was short, prior to the start of the hearing the parties engaged in substantial discovery under the supervision of this Court.

The hearing began on April 29, 1985, and lasted approximately five weeks. There were 10 live witnesses that testified for the plaintiffs and five live witnesses for the defendants. The hearing transcript is approximately 3,500 pages long. Over 20 depositions were submitted to the Court as substantive evidence in addition to the hearing testimony. The parties introduced 587 exhibits in evidence.

The plaintiffs' three expert witnesses were Professor Joseph Bower of Harvard, Professor Werner Sichel, a visiting scholar at the Hoover Institute at Stanford, and Professor Oliver Williamson of Yale. The defendants' expert witness was Professor Benjamin Klein of the University of California at Los Angeles.

Lay witnesses testifying for White were Ward Smith, Chief Executive Officer and President of White; and Harold D. Schafer, Caroll B. Wood, and John Gehling, all officers of White or one of its subsidiaries. Testifying for Magic Chef were Bradford Rymer, Jr., Chairman of Magic Chef; and John M. McDavitt and John Green, both officers of Magic Chef. Testifying for the defendants were Warren Batts, President of Dart and Kraft; David Whitwam, Vice-President of Whirlpool; Dwanton Laverne Seals, President of In-Sink-Erator; and J.J. Adorjan, Executive Vice-President of Emerson. The deposition testimony considered by the Court included that of Jack Sparks, Chairman of Whirlpool; Charles F. Knight, Chairman of Emerson; and Glenn Olinger, President of KitchenAid.

This lengthy hearing, with such distinguished witnesses and such extensive preparation, was tantamount to a hearing on the merits. Indeed, in a rare show of unity, counsel for all parties agreed that the hearing was "the whole ball game." The plaintiffs insisted that if an injunction were denied, divestiture later would be im-

---

1. The Court wishes to stress that it is not bound in any way by the determination made by the Federal Trade Commission in this case. The Court's decision on the pending motions is based exclusively on the evidence and exhibits introduced at the preliminary injunction hearing.

possible. The defendants argued that if an injunction were granted, the deal was likely to fall apart long before a hearing on the merits could take place.

While the Court will not and can not foreclose a trial on the merits, only genuinely new or changed evidence is likely to produce a different result at trial. Still, the attorneys in this case could not have known the nature of the injunction which would be handed down when they declared the proceedings on the injunction would be "the whole ball game." The Court considers it the province of the parties, the business people, to determine how to proceed with their business transaction and this lawsuit from here.

THIS ORDER

The Court notes that this order is not organized with a rigid differentiation between findings of fact and conclusions of law. Throughout the findings of fact section of the opinion, the Court has periodically made conclusions of law. This somewhat unorthodox procedure has been employed because of the need to make conclusions of law at various points in the Court's factual analysis. Conclusions of law made at various stages of the Court's opinion form the basis for the next stage of fact-finding.

In an effort to comply with Fed.R.Civ.P. 52, the Court has included a separate conclusions of law section at the end of this opinion. That section is composed of a reiteration of the legal conclusions, with supportive citations, drawn throughout the findings of fact section.

FINDINGS OF FACT

I. THE PARTIES

A. *Plaintiff White*

Plaintiff White is a publicly held Delaware corporation with its principal offices in Lakewood, Ohio. It is licensed as a foreign corporation to do business in the State of Ohio.

White manufactures, and distributes nationally, a full line of major household appliances including refrigerators, gas and electric ranges, built-in ovens, freezers, laundry equipment and dishwashers, under various private-brand names including "Frigidaire," "White-Westinghouse," "Kelvinator," and "Gibson." In addition, White purchases garbage disposers from Emerson and distributes them under its brand names, "Frigidaire" and "White-Westinghouse." White also buys trash compactors from Whirlpool and markets them under its private name, "Frigidaire." In 1984, White's net sales were $2.1 billion.

B. *Plaintiff Magic Chef*

Plaintiff Magic Chef is a corporation organized for profit under the laws of the State of Delaware. Its principal place of business and its office are in Cleveland, Tennessee.

Magic Chef manufactures, and distributes nationally, electric and gas ranges, refrigerators, microwave ovens, freezers, and laundry equipment under various brand names including "Magic Chef" and "Admiral." Magic Chef also distributes nationally other household appliances including dishwashers, kitchen garbage disposers, and kitchen trash compactors, which it purchases from other manufacturers. Magic Chef markets these products nationwide under its private brand name, "Magic Chef," and other brand names. In 1984, Magic Chef's net sales were $1 billion.

C. *Defendant Whirlpool*

Defendant Whirlpool is a publicly held Delaware corporation with its principal offices in Benton Harbor, Michigan. Whirlpool is licensed as a foreign corporation to do business in the State of Ohio and transacts business in the Northern District of Ohio.

Whirlpool manufactures, and distributes nationally, a full line of major household appliances including refrigerators, electric and gas ranges, built-in ovens, freezers, laundry equipment, dishwashers, and trash compactors under its "Whirlpool" brand name. Whirlpool sells approximately one-half of the appliances it manufactures to

Sears, Roebuck and Co. (hereinafter "Sears") and markets the remainder under the Whirlpool name. Whirlpool is a middle-level marketer with reported sales in excess of $3 billion in 1984.

### D. Defendant D & K

D & K is a publicly held Delaware corporation with its principal offices in Northbrook, Illinois. It is a diversified food and consumer products company which transacts business in the Northern District of Ohio through its agent and wholly-owned subsidiary, Hobart, which it manages and controls.

Dart Industries merged with Kraft Corporation in 1980 and acquired Hobart in 1981. In 1984, D & K's net sales were $9.7 billion.

### E. Defendant Hobart

Defendant Hobart is a Delaware corporation with its principal offices in Troy, Ohio, and is wholly-owned subsidiary of D & K. Hobart is licensed as a foreign corporation to do business in the State of Ohio and transacts business activities in the Northern District of Ohio.

Hobart manufactures, and distributes nationally, lines of dishwashers, disposers, compactors, range tops, built-in ovens, and other kitchen equipment through its KitchenAid division under the "KitchenAid" brand name. Hobart also manufactures, and distributes nationally, a line of cooking products under the "Chambers" brand name.

### F. KitchenAid

KitchenAid is a division of Hobart, a subsidiary of D & K, and primarily manufactures and sells dishwashers. It also manufactures a limited number of other appliances, including trash compactors, disposers, and hot water dispensers.

### G. Defendant Emerson

Defendant Emerson is a publicly held Missouri corporation with its principal offices in St. Louis, Missouri. Emerson is licensed as a foreign corporation to do business in the State of Ohio and transacts business in the Northern District of Ohio. It is a diversified manufacturing company engaged primarily in the manufacture, design, and sale of a broad range of electrical and electronic products.

Among other things, Emerson manufactures, and distributes nationally, a line of kitchen garbage disposers, and markets dishwashers under its brand name, "In-Sink-Erator." In 1984, net sales were $4.2 billion.

## II. THE DYNAMICS OF THE WHITE GOODS APPLIANCE INDUSTRY

The white goods appliance industry is composed of a variety of kitchen and laundry products. The kitchen appliances can be categorized by function, into clean-up products, cooking products, and refrigeration products. The clean-up products include dishwashers, trash compactors, and garbage disposers. The cooking products include various types of ovens and stoves. The refrigeration products include refrigerators and freezers. The laundry products are, of course, washers and dryers.

For the purpose of this case, the Court finds the relevant geographic market to be the United States. The Court also finds the relevant product markets to be the dishwasher, disposer, and compactor markets. In addition, the Court notes that although the relevant product markets are the dishwasher, disposer, and compactor markets, the vast majority of the evidence at the hearing focused on the dishwasher market. The Court concludes from the evidence that the compactor and disposer markets are insignificant when compared to the dishwasher market.

Thus, the dominance of the dishwasher in the proposed transaction requires the Court to focus its analysis primarily on the effect the transaction will have on that market. If the transaction would anti-competitively affect the dishwasher market, it must be enjoined. On the other hand, if the transaction would not have anti-compet-

itive effects in the dishwasher market, the Court will not interfere.

While substantial evidence was presented throughout the hearing regarding the affect the proposed transaction might have on other product markets, such as ovens, refrigeration and laundry equipment, the questions raised by that evidence must be saved for another day. Still, the Court is constrained to note that the volume of testimony about the affect of the transaction on other product markets is, in some ways, indicative of the motivations which caused this action to be brought. It is undoubtedly true that the plaintiffs in this action would be benefited in product markets other than dishwashers, disposers, and compactors if this transaction were blocked. The defendants have urged the Court to believe that this is the primary reason the plaintiffs brought this action.

In the end, the Court finds that the motivation for the filing of the lawsuit is not particularly relevant to the inquiry triggered by the lawsuit: the potential anticompetitive effects of the transaction in the relevant product markets. Accordingly, the Court will focus its attention on that inquiry, regardless of the reasons the question may have been brought here to begin with.

Each player in the appliance industry participates in one or more of five industry functions. These functions are design, manufacturing, distribution, retail, and service. Testimony in the hearing focused primarily on manufacturing, distribution, and retail, with only tangential mention of the other two.

Most of the significant manufacturers in the appliance industry have achieved their status through acquisitions. By way of example, White entered the major appliance industry with its 1956 acquisition of Hupp Manufacturing Company which included the "Gibson" brand name and manufacturing facilities. Since then, White has acquired Kelvinator (from American Motors), Westinghouse (from Westinghouse Electric) and Frigidaire (from General Motors).

Magic Chef acquired the brand name, "Magic Chef," in 1958. In 1966, it acquired another range manufacturer, Gaffers & Sattler. In 1979, Magic Chef acquired its Norge Division (laundry) from the Fedders Corporation, and its Admiral Division (refrigerators and freezers) from Rockwell International. In 1981, it acquired the Revco Division of Rheem which manufactures freezers. In 1983, it acquired Toastmaster which manufactures small kitchen appliances. In 1985, it acquired Warwick Manufacturing Company which manufactures compact refrigerators and freezers.

These acquisitions do not lead the Court to the conclusion that White and Magic Chef come here with unclean hands or that because of the acquisitions they lack standing. In fact, the increased concentration in the industry over the past 10 years appears to have increased competition and benefited the consumer.

While the level of concentration has increased, product durability has improved, with life-spans now averaging around 10 to 12 years, productivity has increased, and prices, in real terms, have gone down. These facts cause the Court to conclude that while there is high concentration in the white goods industry, the industry still remains highly competitive.

One factor which affects the competitiveness of a market is the ease or difficulty of entry. At the marketing level, expansion by existing players in the industry appears relatively easy. In the last 10 years, approximately 10 white goods marketers have begun marketing dishwashers under their own brand name. These include Tappan, Admiral, Roper, Magic Chef, Gibson, Caloric, Jenn-Air, Brown Stove, Panasonic, and Amana.

While entry by new marketers appears to be relatively free, entry by new manufacturers appears substantially more difficult. Domestically, the market has contracted substantially. Many major United States manufacturing companies have exited the business in the last 20 years, including Ford, General Motors, International

Harvester, American Motors, Westinghouse, and Borg-Warner.

Entering the dishwasher business at the manufacturing level can be costly. A plant capable of producing 250,000 dishwashers per year could cost between $15 million and $30 million, and it might take as long as three to five years to be in production.

While entry by foreign competitors appears equally unlikely because of the high entry barriers, there was testimony to suggest that firms like Panasonic and Sanyo are reviewing their prospects. Thus far, these companies have marketed specialty products in non-standard sizes like Sanyo's small refrigerators. Still, Sanyo has also recently introduced a full-sized refrigerator and Panasonic has announced its intention to market a full line of white goods. The Court finds that entry barriers for manufacturers are high, but that there is a reasonable possibility that some foreign manufacturers will, nonetheless, attempt to enter the dishwasher, compactor, and disposer markets.

One unusual characteristic of the appliance industry is the tendency of competitors to sell certain products to each other before the products are sold to the ultimate consumer. This practice has developed because of the desire of firms which only manufacture certain products to sell a full line of appliances with their name on them.

As an example, Whirlpool does not manufacture garbage disposers, so if it wants to sell an "all Whirlpool kitchen" to a home builder, it must purchase garbage disposers from a firm which does make disposers. In Whirlpool's case, it buys its disposers from Emerson. In the parlance of the appliance business, Emerson is therefore a "private label" manufacturer of disposers since it is willing to manufacture disposers with the Whirlpool name on them.

It is significant to this transaction that KitchenAid has never been a private labeler of dishwashers. Since KitchenAid currently makes dishwashers, some witnesses claimed at the hearing that KitchenAid should be considered a potential private labeler of dishwashers for the purpose of analyzing the dishwasher market. Still, testimony from D & K, KitchenAid's owner, was quite firm on this question. D & K insisted that KitchenAid would never be a private labeler of dishwashers since private labeling would dilute the power of KitchenAid's premium name.

The Court finds D & K's testimony on this question to be highly credible. Accordingly, for the purposes of this case, the Court finds that under D & K, KitchenAid can not reasonably be considered a potential private labeler of dishwashers.

There was also substantial testimony at the hearing regarding the channels of distribution in the industry and the forces which guide the retail marketing of the relevant products. With regard to distribution, manufacturers sell to a wide range of buyers before the products ever reach the ultimate consumer. In addition to the private label sales already discussed, manufacturers also sell to distributors, retailers, buying groups for retailers, and home builders.

These various "middle-man" purchasers play an important role in forcing manufacturers to remain competitive. Buying groups purchase approximately 30 percent of all home appliances from the manufacturers. The four largest buying groups, alone, account for approximately 17 percent of sales by manufacturers.

New home builders and Sears have the same competitive effect on manufacturers. The builders tend to purchase full lines of appliances and tend to buy in bulk. Accordingly, they have substantial bargaining power with the manufacturers. Sears has the same sort of power because of the volume of appliance business it does. It is the largest single retailer of white goods and thus can insist upon good prices from manufacturers.

The testimony regarding retailing in the appliance business inevitably led to discussions of retail floor space. All of the industry witnesses on both sides of this case acknowledged that floor space and position-

ing are key to the retailing of their products.

Retailer decisions about which appliances to display are controlled by the nature of the products. Brand names which are bolstered by extensive national advertising and/or strong reputations are stocked by retailers to "pull" customers into their stores. These pull brands are generally higher priced than other brands and the retailer mark-up on them is relatively small.

The remaining brands are sold to retailers at lower prices with manufacturers or distributors frequently providing financial incentives to encourage sales. These incentives, along with the higher mark-up by retailers on these other brands, cause retailers to "push" these brands after customers have been "pulled" into the store.

One element of the plaintiffs' case was a claim that the proposed transaction would allow Whirlpool to force White and Magic Chef off retailers' floors. White's and Magic Chef's brands tend to be push brands while Whirlpool's and KitchenAid's are both pull brands.

The Court is unconvinced by this claim. Retailers, who are members of powerful buying groups, would strenuously resist pressure to eliminate or curtail their stock of push brands in order to stock more pull brands. It is the balance of "pushing" and "pulling" which allows a retailer to maximize profits. Stocking pull brands alone would eliminate the high margins and bonuses earned by retailers through the sale of push brands.

Still, despite all of the testimony regarding distribution and marketing, the Court finds the most relevant evidence to be that concerning manufacturing. Expert and lay testimony alike convinced this Court that the ability to control the number of units manufactured could be translated into the ability to control price. One firm's ability to control price, or even to substantially affect price through control of production, is a substantial danger to the market.

One factor which affects firms' abilities to control output is the extent of the "excess capacity" of each of the firms in the market. Excess capacity is the capacity to produce more units than one already is producing. When firms in a market have substantial excess capacity, one firm's decision to reduce output will not necessarily affect price since other firms will then be able to tap their excess capacity to meet the market demand.

There is currently substantial excess capacity in the dishwasher industry. Experts differed with regard to the abilities of firms in the market to tap that capacity at a reasonable price. Based on the evidence, the Court finds that the existing level of excess capacity is sufficient to act, at least partially, as a check on firms which try to control prices by controlling output.

The substantial dishwasher manufacturers today are General Electric (hereinafter "GE"), Design & Manufacturing (hereinafter "D & M"), Whirlpool, KitchenAid, White, Maytag, and Norris. Their 1983 and 1984 market share, in terms of manufactured units, is reflected in the chart below:

| FIRM/YEAR | 1983 | 1984 |
|---|---|---|
| GE | 28.7 | 38.8 |
| D & M | 36.2 | 25.3 |
| WHIRLPOOL | 17.4 | 18.3 |
| KITCHENAID | 8.0 | 7.1 |
| WHITE | 4.8 | 5.2 |
| MAYTAG | 3.7 | 3.0 |
| NORRIS | 1.2 | 2.3 |

As is apparent from the chart, D & M lost almost 11 percentage points of market share between 1983 and 1984. The Court finds from the evidence at trial that this loss is primarily attributable to D & M's loss of sales to Sears. The evidence also demonstrated that D & M's dishwasher manufacturing competitors have targeted D & M and that the 1983–1984 decline may be only the beginning of D & M's losses in the market.

While D & M was not a party to the action and therefore not in Court to defend itself, the evidence presented proved that D & M's survival in the industry is seriously

in question. Accordingly, in analyzing the proposed transaction, another factor the Court must consider is the likely distribution of D & M market share as it continues to decline. In this regard, the number of viable, post-transaction private labelers from whom D & M's current customers will be able to buy is significant to the Court's analysis. A weakened D & M, and the combination of Whirlpool and KitchenAid without a substantial replacement for KitchenAid, would cause substantial concern.

## III. THE TRANSACTION

There are two stock purchase agreements into which the defendants propose to enter. The first is between Whirlpool and D & K. The second is between Whirlpool and Emerson. Attached to the proposed Whirlpool/Emerson agreement, as an exhibit, is a proposed supply contract between the Traboh Corporation (hereinafter "Traboh") and KitchenAid, companies which, under the stock agreements, would be new subsidiaries of Emerson and Whirlpool, respectively.

### A. *The Whirlpool/D & K Agreement*

Currently, D & K is the sole shareholder in Hobart. In turn, Hobart is the sole shareholder in KitchenAid and Traboh. Traboh, which is Hobart spelled backwards, holds the manufacturing assets and liabilities associated with the Mt. Sterling, Kentucky, dishwasher manufacturing facility and the Louisville, Kentucky, compactor manufacturing facility.

Under the terms of the Whirlpool/D & K agreement, Hobart assets not directly related to KitchenAid are to be transferred to a separate corporation. Hobart, known in its reconstituted form as KitchenAid, will then be sold to Whirlpool. Whirlpool will purchase all stock in KitchenAid for $70,200,000 in excess of the combined net investment of KitchenAid, Traboh, and KitchenAid of Canada as of December 29, 1984. The estimated total purchase price is $150 million.

### B. *The Whirlpool/Emerson Agreement*

Under the terms of this agreement, after acquiring the reconstituted Hobart from D & K, Whirlpool will sell the Hobart subsidiary, Traboh, to Emerson for $31 million. The agreement states that Emerson may not use the names "Hobart" and "KitchenAid" in marketing its products. Most significantly, the agreement requires that at the time of closing, either Emerson or Traboh will execute a contract with either Whirlpool or KitchenAid for the supply of dishwashers, trash compactors, and other materials by Emerson/Traboh to Whirlpool/KitchenAid.

### C. *The Whirlpool/Emerson Supply Contract*

The supply contract called for in the Whirlpool/Emerson stock purchase agreement was attached to that agreement as Exhibit 2. Under the contract, Whirlpool's KitchenAid will buy all of its requirements for Model 21 dishwashers, compactors, and various service parts from Emerson's Traboh. Whirlpool's KitchenAid will pay for these products at a rate reasonably calculated to yield Traboh a net after tax profit of 20 percent of its total operating capital.

The contract is an eight-year agreement. Whirlpool's KitchenAid may terminate the contract after five years by paying a termination fee equal to the book value of Traboh's assets less the salvage, sale, or liquidation value of the assets at the time of termination. Emerson may terminate the agreement at anytime, with 12 months' notice. An election by Emerson to terminate the agreement would relieve KitchenAid of any obligation to pay an early termination fee.

The supply agreement also places certain limitations on Emerson. During the term of the contract, Emerson may only market the Model 21 dishwasher, in the United States, under the name "In-Sink-Erator" or any other registered trademark name consented to by KitchenAid—consent which under the contract is not to be unreasonably withheld. In addition, Model 21 dish-

washers sold by Emerson may only be marketed through the marketing and distribution network of the In-Sink-Erator Division of Emerson.

Further, any Model 21 dishwashers marketed by Emerson may not be confusingly similar in exterior appearance to the Model 21 dishwashers sold to KitchenAid. Emerson is not, however, required to implement major tooling changes to insure that dishwashers it will market are not confusingly similar to those sold to KitchenAid. Any sales of the Model 21, besides those to KitchenAid and those through In-Sink-Erator, are prohibited.

Emerson may sell, distribute, and market the Model 20 dishwasher in any manner it wishes to as long as the product is not confusingly similar in exterior appearance to products sold to KitchenAid. It may market the Model 20 under any name or private label, through any distribution network, to any customer. The same is true of Emerson's compactors. In turn, the contract guarantees that KitchenAid may market any and all of its products in direct competition with Emerson's dishwashers, compactors, and other products.

## IV. THE BASES FOR INJUNCTIVE RELIEF

The plaintiffs present two complementary bases for injunctive relief. First, they argue that a statistical analysis of the proposed transaction reveals its anti-competitive nature and provides the Court with justification to grant their motions. Second, they present a post-transaction market scenario which features a more concentrated market opening the door to illegal anti-competitive conduct, including predation, leverage, and collusion, by the defendants to the detriment of the public.

The defendants respond to each of the arguments by pointing to the pro-competitive effects of the sale of Traboh to Emerson and the accompanying supply contract. They insist that the statistics prove nothing and that the scenario painted by the plaintiffs is absurd. They suggest that the post-transaction market, because of the re-

vitalization of KitchenAid and the entrance of Emerson, will be even more competitive than the pre-transaction market.

■ The Court finds that there is substantial evidence to support the arguments put forward by each of the parties. On balance, though, the Court finds that the plaintiffs' scenario of repeated, illegal, anti-competitive behavior by the defendants to be too speculative to be believed. Instead, the Court finds that the Whirlpool/KitchenAid combination will be a formidable competitor in the post-transaction market. Without a new, independent competitor to replace the independent KitchenAid, Whirlpool is likely to become stronger than the market can withstand.

■ The restrictions placed on Emerson by the supply contract substantially diminish its ability to compete effectively in the dishwasher market. Without Emerson, the plaintiffs' statistics become more compelling and Whirlpool, with its new KitchenAid division, goes unchecked. Though Emerson could be the firm to act as a sufficient check on Whirlpool's post-transaction power, the defects in the curative divestiture cited below mandate the imposition of a preliminary injunction at this time.

### A. The Statistics

The plaintiffs' first line of argument amounts to a statistical indictment of the proposed transaction. They claim that the competitive effects of a merger or acquisition can be determined by comparing the market concentration before and after the proposed transaction. They argue that the greater the increase in market concentration caused by a merger or acquisition, the more likely it is that that transaction is anti-competitive and illegal.

The most traditional means of evaluating market concentration is to determine the total percentage of market share held by the top four firms in that market. Under this analytical approach, one compares the total of the market share percentages of the top four firms before the transaction and the expected total after the transac-

tion. This comparison sheds light on the extent to which the transaction will invest greater market share in the already leading firms. This approach is known as a "four-firm concentration analysis."

In more recent years, pre- and post-transaction concentrations have also been compared through the use of a mathematical formula known as the Herfindahl-Hirschman Index (the "HHI"). An HHI is computed by summing the squares of the percentage of market share held by each of the firms in the market. This approach gives a more accurate reading of the extent to which market share is being spread among firms in the market or is being held by a small number of firms.

The plaintiffs' argument is consistent with the approach taken in the Merger Guidelines of the United States Department of Justice (49 Federal Register 26824, June 29, 1984). Under the 1984 version of those Guidelines, an HHI below 1,000 suggests an unconcentrated market, an HHI between 1,000 and 1,800 suggests a moderately concentrated market, and an HHI above 1,800 suggests a highly concentrated market. Where the post-acquisition market would be in the moderately concentrated range, an acquisition that increases the HHI by more than 100 points will, absent other factors, present serious antitrust questions. Where the post-acquisition market would be highly concentrated, an increase of only 50 points in the HHI will present serious questions. When the HHI increases by over 100 points in a highly concentrated market, the transaction will require extremely careful scrutiny.

Yet the Department of Justice Guidelines do not rely exclusively on statistics. The explanatory statement accompanying the 1984 Guidelines states, in part:

For mergers resulting in an HHI of more than 1800 the Department is unlikely to sue if the increase in the HHI is less than 50 points. The Department is likely to challenge mergers in this region that produce an increase in the HHI of more than 50 points unless the Department concludes, on the basis of the post-merg-

er HHI, the increase in the HHI, and the presence or absence of [other] factors ... that the merger is not likely substantially to lessen competition. However, if the increase in the HHI exceeds 100 and the post-merger HHI substantially exceeds 1800, only in extraordinary cases will such factors establish that the merger is not likely to lessen competition. Despite this fact, the Department will never ignore other factors when they are relevant. 49 Federal Register 26824, June 29, 1984.

During the hearing, there was substantial testimony regarding the proper method of determining market share for the purpose of evaluating market concentration. Some witnesses suggested that percentages should be drawn from the number of units sold, while others argued for computation based on sales revenues. Some claimed that the proper calculations would be based upon sales by brand name, while others insisted that the proper focus was sales by manufacturers. Some testified that market-share percentages should stem from the number of units manufactured, while others based their judgments on the number of units sold.

Yet, despite these varied views on the proper method of calculating market share, the plaintiffs' argument remained consistent: post-transaction concentrations will be impermissibly high and are proof of the anti-competitive nature of the proposed transaction. White and Magic Chef contend that for each of the relevant products, no matter how the calculations are done, a highly-concentrated industry is made more concentrated by the proposed transaction. They argue that the post-transaction HHIs, in all cases, exceed 1,800 points and that the changes in the HHIs exceed 50 points. Further, they argue that under certain calculations, the post-transaction HHI substantially exceeds 1,800 points and that there is more than a 100 point change in the HHI.

The Court agrees that in this highly-concentrated industry, using almost any of the methods for computing market share will

yield high four-firm concentrations and high HHIs both pre- and post-transaction. In addition, the Court finds that using most of the methods of computing market share, the post-transaction HHI exceeds 1,800, and the increase in the HHI resulting from the proposed transaction would exceed 50 points. In some instances, the post-transaction HHI increase would even exceed 100 points.

The plaintiffs presented evidence which demonstrates that the various methods of calculating market share, using various source materials, yield beginning HHIs for dishwashers ranging from 1,599 to 2,572 and post-transaction HHIs ranging from 1,844 to 2,832. Similarly, the beginning HHIs for compactors range from 2,241 to 5,133 and post-transaction HHIs range from 2,972 to 6,062. The beginning HHIs for disposers range from 4,574 to 5,579 and the post-transaction HHIs apparently do not change. Yet these statistics represent the beginning, not the end of the inquiry.

It is undisputed that the dishwasher, disposer, and compactor markets are currently highly concentrated. Accordingly, any transfer of ownership to an existing firm in the market, through merger or acquisition, will increase market concentration. Similarly, an exit from the market through dissolution would raise the HHI, since existing firms would pick up the market share of the exiting firm.

Thus, the only course of action which appears statistically acceptable for a firm which wishes to leave one of these markets, is to sell to a firm not currently in the market. Yet the plaintiffs' expert insisted that entry barriers, like start-up time and start-up costs, effectively bar entrance into these markets by new firms.

The evidence demonstrated that D & K was determined to dispose of KitchenAid. Yet under the scenario painted by the plaintiffs, sale to an existing firm is statistically prohibited, and sale to a new entrant is impractical. This dilemma necessitates the conclusion that the Court must look beyond the statistics alone.

The statistics simply require the Court to look further in examining the proposed transaction to determine whether or not it is, in fact, anti-competitive. While the statistics may appear compelling, the Court considers them to be simply a warning system which alerts regulators that there may be competitive problems with a proposed transaction. When concentrations are high and HHIs change significantly because of a transaction, those charged with maintaining competitive markets are put on notice that there may be a problem.

To rely exclusively on statistics would be to confine the Court's inquiry beyond reason, especially in a case such as this where markets are highly concentrated to begin with. The plaintiffs' argument that statistics alone should be sufficient to block this transaction virtually necessitates the conclusion that any acquisitions by any of the major firms in this industry are anti-competitive and illegal, regardless of the facts surrounding such an acquisition. The Court considers that view to be extreme and inconsistent with the letter and the spirit of the Department of Justice's merger guidelines.

The case law provides that statistics can be used to make out a *prima facie* case of an antitrust violation. Accordingly, disturbing statistics will lead to the conclusion that a proposed merger is anti-competitive, unless evidence to the contrary is presented. Here, the defendants have presented substantial evidence in hopes of demonstrating that the transaction is not anti-competitive. While they deny that the statistics are sufficient to make out the plaintiffs' *prima facie* case, they also contend that if such a *prima facie* case is found by the Court, other evidence rebuts it. The Court considers the market-share concentrations to be substantial evidence of the competitive effect of the market, but does not consider the statistics to be conclusive.

As discussed in the section of the opinion regarding the dynamics of the industry, the Court considers the most relevant evidence to be that which concerns the number of units manufactured by each firm.

Throughout the hearing, expert after expert testified that the ability to control output defines market power since the control of output yields the control of price. Accordingly, the Court adopts percentages of units manufactured as the statistical basis for determining market share for the purpose of examining market concentrations.

The defendants argue that this means of calculating market concentrations shows that there would be no change in the four-firm concentration and no change in the HHI because of the proposed transaction. They argue that KitchenAid's current manufactured units market share would be transferred to Emerson, leaving Whirlpool, GE, White, and the other manufacturers right where they were in terms of manufactured units market share. Accordingly, the defendants claim that the statistics do not set off the anti-competitive warning system, but instead verify that the transaction is fair and proper.

The plaintiffs contend that even using a manufactured units market concentration analysis, the statistics scream of anti-competitive conduct. Their argument is based on their claim that Emerson can not and will not be a meaningful player in the dishwasher manufacturing business. White and Magic Chef argue that the current KitchenAid manufactured units market share should be included in Whirlpool's manufactured units market share rather than Emerson's for the purpose of post-transaction concentration analysis. They believe that the supply contract between Emerson and Whirlpool gives Whirlpool the control over output which a manufacturer usually has. Therefore, they contend, it would be inaccurate to recognize Emerson as having market power commensurate with the KitchenAid manufactured units market share.

When KitchenAid's manufactured units market share is added to Whirlpool's rather than Emerson's, the four-firm concentration and HHI skyrocket. Yet, the plaintiffs' argument hinges on their view that Emerson will never be any more than a subcontractor of Whirlpool's when it comes to dishwasher manufacturing. They argue that entry barriers are high and Emerson's expertise is low. They contend that Emerson and Whirlpool have a sweetheart deal and that Emerson has no incentive to ever manufacture any dishwashers other than those for Whirlpool, which earn them a guaranteed 20 percent profit.

From all of the above, the Court finds that the importance of the statistics hinges upon the viability and sincerity of Emerson as a new competitor in the dishwasher market. If Emerson will become a vibrant new force in the dishwasher market, the plaintiffs' assignment of KitchenAid's manufactured units market share to Whirlpool is inappropriate and the statistical warning system is never triggered. Still, if Emerson is overly optimistic about its prospects or disingenuous about its intentions, the assignment of the KitchenAid percentage points to Whirlpool is proper and the statistical warning system demands careful scrutiny of the transaction. Accordingly, the meaningfulness the Court affords the statistics presented is dependent upon the legitimacy the Court affords the curative divestiture as discussed below.

### B. *The Transaction's Effect on the Market*

#### 1. *White's Story*

At the hearing, White attempted to establish that the post-transaction market will feature a powerful Whirlpool using its enhanced strength to bully competitors out of business. White's scenario also features an ineffective Emerson, unwilling and/or unable to seriously compete in the dishwasher market, and a contented D & K, pleased with the financial killing it made through its sweetheart deal with Whirlpool.

White argued that Whirlpool's effort to purchase KitchenAid is "strategic behavior" designed to enhance Whirlpool's ability to engage in anti-competitive conduct like "collusion," "leverage," and "predation" through the use of "market power." Using this traditional antitrust jargon,

White's experts and corporate officers insisted that the transaction would add to the bank accounts of each of the defendants at the expense of the general public.

White first discussed the transaction as a classic case of "strategic behavior." According to the experts, strategic behavior is corporate conduct designed to reduce competition, primarily through the elimination of competitors. Whirlpool's acquisition of KitchenAid would eliminate KitchenAid as a competitor of Whirlpool's. It would allow Whirlpool to expand into the high-end without competition from KitchenAid and would eliminate the threat of KitchenAid expanding into the mid-range of the dishwasher market.

In addition, the sale of KitchenAid to Whirlpool, according to White, would eliminate KitchenAid's force in the dishwasher market as an innovative and creative competitor. While KitchenAid relied on these characteristics to survive, these laudable corporate traits forced other manufacturers to behave similarly in order to effectively compete. According to White, the loss of KitchenAid would substantially reduce the extent to which the remaining players in the market would feel compelled to innovate. This result, White argued, would only be to the detriment of the consumer.

According to White, D & K's incentive for selling KitchenAid to Whirlpool is purely financial. In White's view, D & K had plans to expand KitchenAid into a full-line of high-end products but when confronted with Whirlpool's $150 million offer, was unable to refuse. White insists that the fact that Whirlpool's offer stood at $150 million, even after learning that KitchenAid's market share was approximately half of what Whirlpool thought it was, strongly indicates the cozy nature of the Whirlpool/D & K deal. According to the plaintiffs' experts, the Whirlpool/D & K stock purchase agreement is an example of the "collusion" which surrounds the proposed transaction.

The plaintiffs contend that another example of collusion in the proposed transaction is the Whirlpool/Emerson agreement. Evidence was presented by the plaintiffs to demonstrate that Whirlpool and Emerson have a long and friendly business relationship. Accordingly, in the plaintiffs' view, when Whirlpool realized the antitrust problems inherent in the KitchenAid purchase, it looked for its friend, Emerson, to lend a hand.

While the defendants insist that the Whirlpool/Emerson agreement is a "curative divestiture" which cleanses the proposed transaction of any antitrust problems, the plaintiffs insist that it is a sham. White contends that Emerson can not and will not be a viable force in the dishwasher market as a result of the Whirlpool/Emerson agreement.

The plaintiffs suggest, instead, that Emerson is either foolishly optimistic about its chances to compete effectively, or insincere about its intentions to do so. Whichever it is, Emerson is guaranteed a comfortable, no-risk 20 percent profit for at least five years at which time the plaintiffs contend it will leave the market. In White's view, Emerson can in no way be considered a replacement for KitchenAid, a new force in the dishwasher market, or a solution to Whirlpool's antitrust problems.

Once Whirlpool controls the KitchenAid brand name, the plaintiffs foresee a harrowing chain of events leading to their own destruction, dramatically reduced competition, and high prices in the dishwasher market. First, the plaintiffs expect Whirlpool/KitchenAid to use "leverage" to force competitors off retailers' floors.

Leverage, in this instance, would be threats by Whirlpool to abandon individual retailers altogether unless they allocate more floor space to Whirlpool/KitchenAid products. The retailers, fearing the loss of Whirlpool and KitchenAid, will succumb to Whirlpool's demands, and will oust the plaintiffs' and other competitors' products in favor of Whirlpool's.

For Whirlpool's smaller competitors, the ouster will mean fewer sales and decreased demand. The decreased demand will force

production reductions and, ultimately, price increases on individual units to absorb increased per unit production costs. Once the spiral is begun, the smaller competitors will never be able to reverse it and will have no choice but to go out of business.

The plaintiffs also contend that once the smaller competitors have been forced to raise prices, Whirlpool will engage in "predation" or predatory pricing to accelerate their destruction. White expects Whirlpool to predatorily lower its prices. At lower prices, the demand for Whirlpool products would increase, forcing a concomitant reduction in the demand for the products of competitors. White and Magic Chef contend that Whirlpool would be willing to take a short-term reduction in profits, or even losses, in order to achieve its predatory goals.

Finally, the plaintiffs contend that once the small competitors are gone, Whirlpool may have sufficient "market power" to control output and thus control price. To the extent Whirlpool can not unilaterally control production and price, it would still be expected to subtly collude with the other market giant, GE, to oligopolistically take unreasonable profits from the consumer.

### 2. *Magic Chef's Story*

The arguments presented above are, in fact, the arguments presented at the hearing by both White and Magic Chef. Still, Magic Chef placed great reliance on one additional argument.

In Magic Chef's view, KitchenAid plays an important role in the dishwasher market as a potential, additional, private-label supplier. Though KitchenAid does not currently private label any dishwashers, the fact that it could if it chose to, forces other private labelers to keep prices down and quality up. The constant threat of KitchenAid to existing private labelers is seen by Magic Chef as an important competitive element of the existing market which is lost by KitchenAid's disappearance from the market. Still, it is important to note that this element of Magic Chef's argument again hinges on the assumption that Emerson will not be a serious private labeler of dishwashers, more than replacing KitchenAid's potential private labeler function.

### 3. *Whirlpool's Story*

Whirlpool's evidence was aimed at demonstrating that the KitchenAid acquisition was motivated by a desire to compete and necessitated by its historical development within the industry. According to Whirlpool, it entered the white goods industry as a manufacturing source for Sears. In the course of its expansion, while continuing to supply Sears, it began to manufacture and distribute under its own name. Whirlpool gained a reputation as a manufacturer and marketer of mid-level products—a reputation which it claims, once rooted, stood firm in the public mind.

Witnesses for Whirlpool pointed to the development in the industry of a premium-level white goods market which currently includes KitchenAid, Maytag, Raytheon (Amana), Norris Industries (Waste King and Thermador), and GE. Tantalized by the high profitability of the upper end of the market, Whirlpool sought to expand into it. However, Whirlpool claimed that due to the difficulty of shaking its mid-range reputation, its efforts to move into the high-end failed.

After unsuccessfully marketing its own high-end products, Whirlpool decided to try to acquire products already recognized as premium products by the consuming public. In 1983, Whirlpool approached Sub-Zero, a manufacturer and marketer of high quality, built-in refrigerators, but Sub-Zero was not interested in being acquired. That same year, Whirlpool sought to bid on Norris' Thermador and Waste King, but Norris would not consider a sale.

Whirlpool's witnesses went on to state that in 1984 they conceived of the idea of purchasing KitchenAid and expanding into a full-line, high-end white goods brand name. They argued that such an acquisition of KitchenAid would not be anti-com-

petitive since KitchenAid was on the decline and the acquisition would revitalize it.

With regard to the specific allegations by the plaintiffs, Whirlpool rejected them as inaccurate and/or too speculative to be believed. They argued that even without the "curative divestiture" they would not gain sufficient market power to be a genuine threat to competition. They claimed that the ability of competitors to expand output, utilizing their "excess capacity," would keep the combined Whirlpool and KitchenAid sufficiently in check to prevent restrictions in production leading to higher prices.

Whirlpool also claimed that entry barriers, especially for new marketers, are not so high as to prevent new competitors from entering the industry should existing players get greedy and raise prices excessively. Finally, Whirlpool contended that there was no evidence at the hearing to demonstrate that even a powerful Whirlpool would engage in illegal, anti-competitive conduct like leverage, predation, and collusion.

Still, Whirlpool's primary argument was that even if the Whirlpool/KitchenAid merger presented antitrust problems in the dishwasher market, those problems would be cured by the divestiture of the KitchenAid dishwasher and compactor manufacturing plants to Emerson. According to Whirlpool, the complete transaction would result in Whirlpool manufacturing a product it had never manufactured before (disposers) and Emerson adding two products to its inventory (compactors and dishwashers). In terms of units manufactured, KitchenAid's market share would simply be shifted to Whirlpool (for disposers) and Emerson (for dishwashers and compactors) without increasing the market share percentages held by any existing manufacturer.

In Whirlpool's view, the post-transaction industry concentration levels in the dishwasher, disposer, and compactor markets would be identical to the pre-transaction levels. In addition, the dishwasher market would lose a declining competitor with un-supportive senior management and replace it with a strong, new, well-regarded entrant. These arguments again point out the pivotal significance of the curative divestiture and expectations regarding Emerson's post-transaction market performance.

### 4. *D & K's Story*

D & K claims that after several years of unsatisfactory performance it has decided to sell KitchenAid, and that Whirlpool's unsolicited offer came just at the right time. While D & K had little to say at the hearing about its expectations for the post-transaction market, its witnesses attempted to confirm that the rejuvenation of KitchenAid by D & K appeared highly unlikely at the time of Whirlpool's offer.

D & K presented itself as a diversified food and consumer products company. It claimed to impose high performance and profitability standards on its many subsidiaries. Corporate officers testified that when a subsidiary does not meet its expected performance levels, it is disposed of. D & K officers testified that the company had sold approximately 25 of its subsidiaries since 1980.

In 1981, D & K acquired Hobart, a company whose principal business was the manufacture and sale of commercial equipment for the food industry. D & K considered Hobart's primary business functions to be complementary to D & K's corporate thrust. One of Hobart's subsidiaries, though, did not seem to ever quite fit. That subsidiary was KitchenAid, a manufacturer and marketer of home kitchen appliances.

When D & K originally bid on Hobart, KitchenAid's market share was approximately 17 percent. By the time D & K actually bought Hobart, KitchenAid's market share had slipped almost 10 percentage points. Between 1981 and 1984, KitchenAid's market share remained at about 7–8 percent. The management at KitchenAid felt that any declines had been checked and that they were ready to expand KitchenAid into a full line of high-end products.

According to D & K, these views and plans were not shared by D & K's senior management. Unbeknownst to KitchenAid's managers, D & K had decided that KitchenAid would never be a comfortable fit with D & K's other product lines, that KitchenAid was not sufficiently profitable to keep, and that it was time to sell.

Whirlpool's desire to get its hands on the "Mercedes Benz" of the dishwasher market resulted in an impressive offer to D & K. While D & K was anxious to sell to Whirlpool at the offered price, it knew the corporate disruptiveness caused by an announced sale which falls through. Therefore, D & K claims, it insisted that before it would sell to Whirlpool, Whirlpool had to take steps to eliminate all potential antitrust problems which might prevent the transaction from going forward. D & K claims that it insisted on a "slam-dunk" transaction which would avoid any possibility of interference by the Federal Trade Commission or the courts.

The divestiture of the KitchenAid dishwasher and compactor manufacturing plants accompanied by the supply agreement were considered by D & K sufficient to cure any antitrust problems. Once again, the significance of the legitimacy of the curative divestiture is apparent.

### 5. *Emerson's Story*

Emerson presented itself at the hearing as a tough, lean, competitive company, always looking for an acquisition that it can make profitable. Its officers testified that Emerson's cost consciousness and efficiency allow it to acquire companies whose products have average sales records and transform them into market leaders. Emerson's annual report for 1984 reflected Emerson's placement as first or second in the vast majority of its product markets.

Emerson pointed to two examples of this historical pattern, one in the appliance industry and one not. Officials at Emerson testified that when they took over In-Sink-Erator garbage disposers, its market share was less than 30 percent and there were two competitors well ahead of them. To-

day, according to Emerson, In-Sink-Erator sells almost 70 percent of all disposers in the country and is the virtually unchallenged leader in the industry. Emerson claims that its acquisition of Poulan chain saws led to an equally impressive transformation in that product market.

While the plaintiffs claim that Emerson will never make it in the dishwasher market, Emerson points to its record and states its intention to proceed at full speed. The plaintiffs' claim that favorable terms of the Emerson supply contract suggest collusion on the part of Emerson and Whirlpool. Emerson responds that in order to accomplish a meaningful curative divestiture, Whirlpool needed to sell to Emerson and Emerson was put in a tremendous bargaining position.

The supply agreement allows Emerson to market Model 21 dishwashers under its own name and to market Model 20 dishwashers to anyone it wants to under virtually any name. The supply contract also provides Emerson between five and eight years to develop its position in the market while earning a 20 percent profit on invested capital. Since Emerson begins with a dishwasher plant already tooled to build the "best dishwasher in the world," Emerson believes that it will be a force to reckon with in the industry in no time.

### 6. *The Court's View*

As noted above, the Court finds there to be evidence to support each of the allegations made by the parties. Still, by the conflicting nature of those allegations, all of the evidence can not be believed, and the Court must base its decision on the facts it finds most likely to be true.

The plaintiffs first argued that Whirlpool was motivated to buy KitchenAid by its desire to eliminate a competitor. The Court finds from the evidence presented that KitchenAid, while owned by D & K, was not likely to expand into Whirlpool's mid-range. Further, the Court finds that Whirlpool's inability to succeed in the high-

end with its own products was the primary motivation for the acquisition.

White and Magic Chef also argued that once Whirlpool acquired KitchenAid, it would use enhanced market power to engage in illegal anti-competitive practices like collusion, leverage, and predation. The Court finds the evidence of these allegations to be too speculative to conclude that Whirlpool presently intends to engage in illegal conduct of the types described.

Finally, the plaintiffs argue that the transaction will result in the loss of the independent KitchenAid and a substantial enhancement of Whirlpool's market power. They argue that this enhanced power stems from the control Whirlpool will wield as a result of the supply contract over the Emerson-owned, former KitchenAid dishwasher manufacturing plant. As part of this argument, the plaintiffs contend that Emerson will never be a viable participant in the market and that Whirlpool's control of output will go unchecked. They argue that existing private labelers lack sufficient excess capacity to absorb the market share available due to the decline of D & M.

The Court finds this argument to be substantially more compelling than the others. The Court is required to consider more than just the immediate post-transaction market shares of the firms involved in a merger or acquisition. Instead, the Court must consider the effects the proposed transaction is expected to have on the entire market. Further, that inquiry must look beyond the market concentration which will exist on the day the transaction would close. It must consider, given the specific market dynamics, which effects the post-transaction concentration is likely to have in the future.

A transaction which provides a firm with the clear *ability* to act in an anti-competitive manner, at its whim, or is likely to provide a firm that ability in the foreseeable future, may be enjoined. Under certain facts, such a transaction may be so inherently likely to substantially reduce competition that it must be stopped.

The question, then, is whether the post-transaction Whirlpool would, in fact, have the degree of unchecked market power which is inherently anti-competitive. This determination once again hinges on the performance of Emerson in the post-transaction market.

While the parties presented substantial testimony regarding Whirlpool's intentions to expand KitchenAid across the high-end, this case is about dishwashers, compactors, and disposers. The Court notes that Whirlpool's expansion of KitchenAid into product lines which D & K did not intend to take KitchenAid is clearly a pro-competitive act in those product lines. But this Court is faced here with only the dishwasher, compactor, and disposer markets. As noted earlier, because of the limited information provided and the comparative insignificance of the compactor and disposer markets, the Court's inquiry, in fact, focuses almost exclusively on the dishwasher market.

In the plaintiffs' views, Emerson will be either unable or unwilling to sell more dishwashers than those called for by the supply contract. If this is true, Whirlpool will have effective control over the number of units manufactured by Emerson. This control would provide Whirlpool with sufficient market power to affect the total production output in the industry, and thus to affect price. That much power invested in one firm in the market would be anti-competitive. Accordingly, if Emerson is either unable or unwilling to become a substantial participant in the dishwasher market, the transaction must be enjoined.

On the other hand, if Emerson is both willing and able to move successfully into the dishwasher market, it will control its own levels of production. If it chooses to abandon the supply contract with Whirlpool because even more profitable doors have opened, it may do so with one year's notice. An independent Emerson would help to limit Whirlpool's market power and reduce its control of the number of dishwashers manufactured for the market.

In the end, therefore, the permissibility of the proposed transaction hinges entirely upon whether the sale of the KitchenAid dishwasher manufacturing plant to Emerson is, in fact, a divestiture, and is, in fact, curative.

## IV. THE CURATIVE DIVESTITURE

### A. *One Transaction*

Both an analysis of the statistics and the substantive analysis of the market lead to the same conclusion: the divestiture of the manufacturing assets of KitchenAid to Emerson and the accompanying supply agreement provide the key to determining whether anti-competitive effects will result from the proposed transaction. The transaction here consists of two parts—the acquisition of KitchenAid by Whirlpool and the spin-off sale of the KitchenAid manufacturing assets to Emerson. Still, for the purpose of antitrust analysis, the Court considers the two stock purchase agreements and the supply contract to be all part of one transaction.

In determining the competitive effects of this transaction, the Court must compare the existing market to the expected market after the execution of all of the proposed contracts. Accordingly, the Court finds an analysis of the Whirlpool/D & K agreement, alone, to be irrelevant. If the Whirlpool/D & K agreement is executed, the Whirlpool/Emerson agreements will be, too. Therefore, the only relevant analysis is that which considers the entirety of the market with regard to all proposed transactions.

### B. *The Standards for Evaluation*

Antitrust literature has coined the phrase "curative divestiture" to describe transactions like the Whirlpool/Emerson agreements—transactions designed to eliminate antitrust problems stemming from a merger or acquisition. When a merger or acquisition will result in the impermissible control of a certain market in a certain geographic region, merging or acquiring firms may elect to divest some of their assets in order to cure the antitrust problem.

If the divestiture is genuine and complete, it may well accomplish its curative goals. However, to qualify as a curative transaction, the divestiture must meet two requirements. First, the purchasing firm must be a viable company with the capacity to compete effectively in the market. Second, the purchasing firm must be free to operate the divested business absent control by the seller. In evaluating a curative divestiture, the real substance of the agreement will be determinative. The transaction can not be in form only.

The seller in a curative divestiture transaction is placed in a difficult bargaining position. While hoping to sell for the best price possible, the seller has been forced into the transaction in order to sanitize an otherwise illegal merger. A buyer is needed to make the original merger acceptable and the seller must divest or lose the original deal. Failure to find a substantial, viable buyer may kill the original deal because of the anti-competitive implications that would remain. Thus, buyers in curative divestiture transactions may be able to negotiate highly favorable terms. Frequently, the more favorable the terms for a divestiture buyer, the less suspect is the divestiture transaction.

### C. *The Court's Conclusion*

The plaintiffs argue that the Whirlpool/Emerson supply contract is highly irregular and places Emerson in the position of a Whirlpool subcontractor. Still, in evaluating the divestiture transaction, there are a number of factors in the supply contract which provide Emerson with independence.

First, the agreement by Whirlpool to pay Emerson for dishwashers at a rate of cost plus 20 percent over invested capital guarantees Emerson the ability to be profitable in the business for the duration of the supply contract. Second, the supply contract is sufficiently long to give Emerson an opportunity to develop in the market.

Third, there are financial disincentives for Whirlpool to terminate the contract prior to its eight-year expiration date. Fourth, Emerson will begin its new dishwasher market participation with plants tooled to make "the best dishwasher in the world." This, combined with the five to eight years of guaranteed profitability on sales to Whirlpool, will help Emerson tap the excess capacity in the manufacturing plants and begin to service private label customers. Fifth, Emerson's ability to terminate the supply contract at anytime with one year's notice, allows it the opportunity to abandon the Whirlpool supply contract if even more profitable opportunities present themselves.

There is no doubt that Emerson has negotiated favorable terms for itself under the supply contract. Yet, in spite of these favorable terms, other provisions present problems. For this divestiture to be curative, Emerson must be free to operate as an independent player in the dishwasher market. Several terms in the supply agreement pose problems. While this Court is entirely convinced that Emerson intends to proceed in good faith, the Court is concerned that these provisions may inhibit its ability to compete effectively.

As noted in section III–C of the opinion, under the supply contract Emerson may only market the Model 21 dishwasher in the United States, under the name "In-Sink-Erator" or any other registered trademark name consented to by KitchenAid—consent not to be unreasonably withheld. In addition, Model 21 dishwashers sold by Emerson may only be marketed through the marketing and distribution network of the In-Sink-Erator Division of Emerson. Any sales of the Model 21, other than those through In-Sink-Erator or those to Whirlpool, are prohibited.

While the Court is impressed with Emerson's history, these limitations will substantially hinder Emerson's ability to freely compete against Whirlpool and other players in the dishwasher market. The restrictions imposed by the supply contract prohibit the private labeling of the Model 21, a restriction clearly in restraint of free trade.

For this divestiture to be curative, Emerson would have to be free to manufacture, distribute, and market the Model 21 under any name not confusingly similar to KitchenAid's. In addition, Emerson would have to be free to distribute the Model 21 through any means it chose. Finally, Emerson would have to be free to private label the Model 21. The Court finds that these restrictions are sufficiently inhibitive of Emerson's ability to compete in the market that Emerson will not act as a post-transaction check on Whirlpool and will not in any way make up for the loss of KitchenAid.

Given the Court's finding, under the existing supply agreement, Emerson's manufactured units market share would be fairly attributed to Whirlpool. Accordingly, the level of the four-firm concentration and the HHI achieved as a result of the transaction, and the change caused by the transaction, creates a *prima facie* illegal transaction.

The Court must, therefore, determine whether the defendants have overcome the *prima facie* case made out by the statistics. Again, the Court finds that the features of the supply agreement discussed immediately above so hinder Emerson that Whirlpool will effectively control Emerson's level of production.

This control will provide Whirlpool with substantially increased market power, and the accompanying ability to restrict output and increase prices. In addition, with the continuing decline of D & M, private label customers will have fewer manufacturers to turn to, and Whirlpool's and GE's manufactured market shares are likely to increase further. While a viable Emerson would provide private label customers somewhere to turn other than the industry giants, the limitations placed on Emerson by the supply contract foreclose that possibility.

The Court finds that the transaction would increase Whirlpool's ability to restrict output and raise prices and that, over time, that ability would increase further.

Given the current state of the dishwasher market, the Court finds that such an ability is likely to substantially reduce competition, and therefore is compelled to issue a preliminary injunction at this time.

CONCLUSIONS OF LAW

1. This action arises under Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 18, 26, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337. Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and Section 1391 of the Judiciary Code, 28 U.S.C. § 1391.

■ 3. Plaintiffs seek preliminary and permanent injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. In the Sixth Circuit, the traditional four-part standard governs the issuance of preliminary injunctions:

(1) Whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

(2) Whether the plaintiff has shown irreparable injuries;

(3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

(4) Whether the public interest would be served by issuing a preliminary injunction.

*Warner v. Central Trust Co.,* 715 F.2d 1121, 1123 (6th Cir.1983).

■ 4. In determining whether to grant a preliminary injunction the Court must consider each of these four factors. However, these factors do not establish a rigid or comprehensive test for determining the appropriateness of a permanent injunction. The district court must instead "engage in a realistic appraisal of all the traditional factors weighed by a court of equity." *Christian Schmidt Brewing Co. v. G. Heilman Brewing Co., Inc.,* 753 F.2d 1354, 1356 (6th Cir.1985).

■ 5. A competitor who makes a "sufficient showing of potential or threatened antitrust injury to meet the customary re-quirements for a grant of preliminary injunctive relief" has standing to assert a claim under Section 7 of the Clayton Act. *Christian Schmidt Brewing Co. v. G. Heilman Brewing Co., Inc.,* 753 F.2d 1354 (6th Cir.1985).

■ 6. The fact that White and Magic Chef have achieved their own status through past acquisitions does not lead this Court to conclude that they had "unclean hands" which would deprive them of standing.

7. Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits merger or acquisition between persons engaged in activities in or affecting interstate commerce "where in any line of commerce in any section of the country, the effect of such acquisition may be to substantially lessen competition, or to tend to create a monopoly."

8. Section 16 of the Clayton Act, 15 U.S.C. § 26, gives "[a]ny person, firm, or corporation" the right "to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws ... under the same conditions and principles used by courts of equity in granting injunctive relief."

9. Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade."

■ 10. Section 2 of the Sherman Act, 15 U.S.C. § 2, forbids monopolization or attempts to monopolize, or combinations or conspiracies to monopolize any part of interstate commerce. These prohibitions extend to acquisitions as well as other anti-competitive business behavior.

11. Initially, the Court notes that a parent company is free to sell a subsidiary at anytime, as long as that sale does not violate the antitrust laws.

■ 12. As a threshold matter in determining an acquisition's likely effect on competition, the court must delineate the relevant product market(s) ("line of commerce") and relevant geographic market(s)

("section of the country"). *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Lynch Business Machines v. A.B. Dick Co.,* 594 F.Supp. 59, 68 (N.D.Ohio 1984). The impact of the challenged acquisition must then be measured in each economically significant market.

13. In the instant case, the relevant product markets are dishwashers, compactors, and disposers, respectively. The dominance of the dishwasher in the proposed transaction, however, requires the Court to focus its analysis primarily on the effect the transaction will have on that market.

14. The relevant geographic market in this case is the United States.

15. In addition to determining relevant product and geographic markets, it is necessary in this case to determine the level of production at which the transaction is to be measured. This Court concludes that *manufacturing* is the most appropriate level at which to evaluate the acquisition's effects on competition.

■■■ 16. When determining an acquisition's impact on competition, factors to consider include "the market shares of the merging firms, industry trends towards concentration, the degree of concentration within the industry, prior mergers by the firms in question, and the barriers to entry in the industry … This list of factors is not exhaustive." *FTC v. Warner Communications Inc.,* 742 F.2d 1156, 1162–1163 (9th Cir.1984), *citing Marathon Oil Co. v. Mobil Corp.,* 530 F.Supp. 315, 325 (N.D. Ohio), *aff'd,* 669 F.2d 378 (6th Cir.1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982).

17. Two statistical methods of analyzing industry concentration are the "four-firm concentration analysis" and the Hirfendahl-Hirschman Index (the "HHI"). Under the four-firm concentration analysis, a comparison is made of the total market shares of the top four firms before the transaction and as anticipated after the transaction.

Under the HHI method, a market share reading is obtained by summing the squares of the percentage of market share held by each of the firms in the market. Under the 1984 version of those Guidelines, an HHI below 1,000 suggests an unconcentrated market, an HHI between 1,000 and 1,800 suggests a moderately concentrated market. Where the post-acquisition market would be in the moderately concentrated range, an acquisition that increases the HHI by more than 100 points will, absent other factors, present serious antitrust questions. Where the post-acquisition market would be highly concentrated, an increase of only 50 points in the HHI will present serious questions. When the HHI increases by over 100 points in a highly concentrated market, the transaction will require extremely careful scrutiny.

■■■ 18. Statistics may be used to make out a *prima facie* case of an antitrust violation. *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Accordingly, disturbing statistics will lead to the conclusion that a proposed merger is anti-competitive, unless evidence to the contrary is presented. *United States v. General Dynamics Corp.,* 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974). Thus, the Court considers the market-share concentrations to be substantial evidence of the competitive effect of the market, but does not consider the statistics to be conclusive. In this case, the Court finds that the importance of the statistics hinges upon the viability and sincerity of Emerson as a new competitor in the dishwasher market.

■■■ 19. The anticompetitive effects of an acquisition might be proved by showing that the defendant engaged, or intends to engage, in practices of collusion, leverage, and predation. In this case, however, that evidence does not show that Whirlpool has engaged, or is likely to engage, in these practices. Therefore, on this aspect of their allegations, plaintiffs have not shown a substantial likelihood of success on the merits.

20. A transaction which provides a firm with the clear *ability* to act in an anti-competitive manner, at its whim, or is likely to provide a firm that ability in the foreseeable future, may be enjoined. In the instant case, Whirlpool's post-acquisition ability to act in an anti-competitive manner hinges upon the performance of Emerson in the post-transaction market.

21. In the end, therefore, the permissibility of the proposed transaction hinges entirely upon whether the sale of the KitchenAid dishwasher manufacturing plant to Emerson is, in fact, a divestiture, and is, in fact, curative.

22. The transaction here consists of two parts—the acquisition of KitchenAid by Whirlpool and the spin-off sale of the KitchenAid manufacturing assets to Emerson. For the purpose of antitrust analysis, the Court considers the two stock purchase agreements and the supply contract to be all part of one transaction. *United States v. Connecticut National Bank*, 362 F.Supp. 240, 283 (D.Conn.1973), *vacated on other grounds*, 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974).

23. To qualify as a curative transaction, the divestiture must meet two requirements. First, the purchasing firm must be a viable company with the capacity to compete effectively in the market. Second, the purchasing firm must be free to operate the divested business absent control by the seller. In evaluating a curative divestiture, the real substance of the agreement will be determinative. The transaction can not be in form only. *United States v. Atlantic Richfield Company*, 297 F.Supp. 1061 (S.D.N.Y.1969); *FTC v. Atlantic Richfield Co.*, 549 F.2d 289 (4th Cir.1977); *United States v. Connecticut National Bank, supra*, 362 F.Supp. at 283.

24. For the divestiture in this case to be curative, Emerson would have to be free to manufacture, distribute, and market the Model 21 under any name not confusingly similar to KitchenAid's. In addition, Emerson would have to be free to distribute the Model 21 through any means it chose. Finally, Emerson would have to be free to private label the Model 21. The Court finds that these restrictions are sufficiently inhibitive of Emerson's ability to compete in the market that Emerson will not act as a post-transaction check on Whirlpool and will not, in any way, make up for the loss of KitchenAid.

25. Since the above-listed defects prevent the Emerson spin-off from constituting a *curative* divestiture, this Court concludes that Emerson's manufactured units market share must be fairly attributed to Whirlpool. Accordingly, the level of the four-firm concentration and the HHI achieved as a result of the transaction, and the change caused by the transaction, creates a *prima facie* illegal transaction. Moreover, because of the defects in the attempted curative divestiture, the Court finds that the transaction would increase Whirlpool's ability to restrict output and raise prices, an ability which, over time, would increase further. Given the current state of the dishwasher market, the Court finds that such an ability is likely to substantially reduce competition.

26. Since Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits any acquisition the effect of which may be to substantially lessen competition, this Court concludes that, in its present form, the contested acquisition presents a substantial likelihood of violating Section 7 of the Clayton Act. This Court does not reach the question of whether there is a substantial likelihood of success on the merits of the Sherman Act Claims, Sections 1 and 2, 15 U.S.C. §§ 1 and 2. *See Monfort of Colorado, Inc. v. Cargill, Inc.*, 591 F.Supp. 683, 710 (D.Colo. 1983).

27. Therefore, this Court concludes that plaintiffs, having made a sufficient showing of potential or threatened antitrust injury to meet the customary requirements for a grant of preliminary injunctive relief, have standing to assert the Clayton Act, Section 7 claim. *Christian Schmidt Brewing Co. v. G. Heilman Brewing Co., Inc., supra.*

28. This Court further concludes that plaintiffs have established entitlement to the grant of a preliminary injunction. Plaintiffs have shown a strong or substantial likelihood or probability of success in proving an antitrust violation. Plaintiffs have shown that, in its present form, the acquisition, if not enjoined, could cause irreparable injuries to them, and would be detrimental to the public interest. Finally, the issuance of a preliminary injunction would not cause substantial harm to others.

29. A preliminary injunction may be vacated or dissolved at anytime prior to a hearing on the merits. If, after the issuance of a preliminary injunction, a merger agreement is amended or revised to eliminate anti-competitive defects, the preliminary injunction may be vacated.

PRELIMINARY INJUNCTION

For all of the foregoing reasons, this Court grants the plaintiffs' motion for preliminary injunction.

This preliminary injunction is granted because of the stated defects in the supply agreement which taint the curative divestiture.

It is noted that this Court has not decided the case on the merits nor entered a final judgment.

IT IS SO ORDERED.